# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MADERA WEST CONDOMINIUM
ASSOCIATION, a Washington non-
profit corporation; THOMAS FASSLER;
JOHN BERRY; TAMARA VERA;
MICHELLE DONALDSON; JACK
RADFORD; JAY INGWALDSON;
DOROTHY ROCKEY; ALLAN FULLER;
SCOTT PERRY; RYAN FIDLER;
DANIELLE TOWNSEND; DIANA
CRETTOL; HANNAH ALMARAZ;
KEITH BRETT; LEONOR CASTELLAR;
GARY EVANS; LATRELLE GIBSON;
LINDA GRESETTE; RICHARD
HARRISON; CINDY KALLENBERG;
BRENNA LARSEN-THIEL; CANDICE
McKINNEY; JAYNE MILLER; MICHAEL
OCTAVE; HENRI PARREN; PAUL
PATTELLE; TONI POSEY; KELLY
ROBINSON; MICHAEL SMITH;
JEROME SZYMANSKI; STEVEN
TOLLEY; ERIN ZAMORA; ROCIO
TRUJILLO; GWEN BERVEN; MARY
BIZZELL; PAUL BOVA; ALYSON
BROWN; ADAM CARTER; ALTHEA
CHANG; JENNIFER COPE; JEFF
DANNENBERG; LEE ELLIOTT; GARY
GESELL; JONATHAN JONES;
COURTNEY LINDSAY; MICHAEL
OKUDA; GABRIEL ORTIZ; MARCIA
PETERSON; ERIK SOCTT; DAN
SKINNER; DIANNA STACY; JIMMIE
STOKES; BEVERLY STOKES; ADAM
STOKES; LINDA UPSHAW; ROSIE
WHITE; ERIK WINKLER; and KARL
YAUCH, Washington residents,

   Appellants/Respondents,

    v.

No. 68127-3-I
(Consolidated with
No. 68522-8-I)

DIVISION ONE

UNPUBLISHED

FILED: July 1, 2013

MARX/OKUBO, a Washington corporation, )
)
)
Respondent/Appellant, )
)
MADERA WEST, LLC, a Washington )
corporation; JESSE NELSON, a )
Washington resident; and COLDWELL )
BANKER BAIN ASSOCIATES, a )
Washington corporation, )
)
Defendants. )
)

Cox, J. — Madera West Condominium Association and multiple individual condominium unit owners (collectively "COA") appeal the summary dismissal of their action for negligence against the architectural firm of Marx/Okubo & Associates, Ltd. ("Marx/Okubo"). Marx/Okubo appeals the trial court's denial of its motion for attorney fees and sanctions under CR 11 and CR 26(g). We consolidate these linked appeals for decision.

The COA fails to show that Marx/Okubo owed it any statutory or common law duty for a professional negligence claim. Thus, there are no genuine issues of material fact for trial on this claim. Further, the negligent misrepresentation claim has been abandoned on appeal.

Marx/Okubo fails to show that it is either entitled to an award of attorney fees or that the trial court abused its discretion in denying sanctions. We affirm.

In 1996, Marx/Okubo inspected and evaluated the condition of the Forest Village Apartments' ("Apartments") siding for the Apartments' then owner. The siding was evaluated based on criteria established by a class action suit against

2

the siding's manufacturer. Marx/Okubo concluded that approximately 35 percent of the siding was damaged.

In 2005, A.F. Evans Development, Inc. ("A.F. Evans"), the prospective purchaser of the Apartments, hired Marx/Okubo to inspect the property. The purposes of this inspection included determining the condition of the property in preparation for A.F. Evans to convert the property to condominiums.

Marx/Okubo inspected the Apartments and produced a "Property Condition Assessment" in April and a "Reserve Study" in May. The property assessment summarized Marx/Okubo's "review of the physical conditions; architectural, mechanical, and electrical components . . . and the quality of construction." The reserve study provided "a forward projection of major costs of repairs and replacements that the Forest Village Homeowners Association should anticipate in planning and budgeting for a reserve fund."

Marx/Okubo gave the following summary of the Apartments' siding: "The siding appears to be performing as expected considering the age and use of the buildings. Isolated areas of siding damaged from rainwater splash were observed."

In May 2005, A.F. Evans purchased the property. Thereafter, the property was converted to condominiums. Madera West, LLC ("MW, LLC"), was the developer and declarant of the Madera West Condominiums ("Madera West").

The COA commenced this action against MW, LLC, and others. The COA later joined Marx/Okubo as a defendant. In its Third Amended Complaint, the

COA asserted claims for negligent misrepresentation and professional negligence against Marx/Okubo.[1]

In November 2011, the COA and Marx/Okubo made cross motions for summary judgment. Marx/Okubo argued that the COA failed to establish a negligent misrepresentation claim and that it did not owe the COA a duty for a professional negligence claim. In the COA's motion for partial summary judgment, the COA sought determinations that (1) the COA had standing to pursue its negligence claims on its own behalf and on behalf of individual unit owners, and (2) Marx/Okubo breached a duty of care it owed to the COA. Additionally, the COA moved to strike portions of Randy Hart's declaration that Marx/Okubo submitted in opposition to the COA's motion for partial summary judgment. Hart is an architect and a principal at an engineering firm who reviewed the records produced in discovery for this case.

The trial court granted Marx/Okubo's motion for summary judgment and dismissed, with prejudice, all of the COA's claims against Marx/Okubo. It also denied the COA's motion for partial summary judgment and dismissed its claims based on lack of standing. For purposes of this latter motion only, the court also denied the COA's motion to strike portions of Hart's declaration.

In February 2012, Marx/Okubo moved for an award of attorney fees and sanctions. The trial court denied both requests.

The COA and Marx/Okubo both appeal.

---

[1] Clerk's Papers (No. 68127-3) at 700-716.

## PRELITIGATION NOTICE

The COA argued in its briefing on appeal that it was not required to give Marx/Okubo prelitigation notice. Marx/Okubo contends that this issue is moot. We agree that this issue is moot, and the COA properly conceded this point at oral argument on appeal.

Generally, this court will not consider a moot issue unless it involves "'matters of continuing and substantial public interest.'"[2] "'A case is technically moot if the court cannot provide the basic relief originally sought . . . or can no longer provide effective relief.'"[3] Mootness is a question of law that this court reviews de novo.[4]

There are exceptions that permit a court to reach a moot issue, but these exceptions do not apply to this case.

Here, the trial court granted the COA's motion for leave to rejoin Marx/Okubo as a party after it complied with the prelitigation notice requirement and statutory procedures. Because this court cannot provide any relief that the trial court has not already provided, this issue is moot. We need not address this issue further.

---

[2] In re Cross, 99 Wn.2d 373, 377, 662 P.2d 828 (1983) (quoting Sorenson v. City of Bellingham, 80 Wn.2d 547, 558, 496 P.2d 512 (1972)).

[3] Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd., 131 Wn.2d 345, 350-51, 932 P.2d 158 (1997) (citations omitted) (quoting Snohomish County v. State, 69 Wn. App. 655, 660, 850 P.2d 546 (1993)).

[4] Hilltop Terrace Homeowner's Ass'n v. Island County, 126 Wn.2d 22, 29, 891 P.2d 29 (1995).

## STANDING

The COA next argues that the trial court erred when it summarily dismissed the Condominium Owners Association's ("Association") claims against Marx/Okubo on the basis that the Association lacked standing. We agree in part.

Because we refer to the Association and the individual unit owners collectively as the "COA," we refer to the Association separately when discussing its standing.

A motion for summary judgment may be granted when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law.[5] This court reviews a summary judgment order de novo, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party.[6]

There are two issues. The first is whether the Association lacked standing to bring the claims on its own behalf. The second is whether the Association lacked standing to bring the claims on behalf of condominium unit owners. We address each issue separately.

### The Association's Standing on Behalf of Itself

The COA argues that the Association has standing to bring claims on its own behalf. It contends that the Association has a property interest in Madera West's common elements and the reserve account, which satisfies the standing requirements. We disagree.

---

[5] CR 56(c).

[6] Lam v. Global Med. Sys., Inc., 127 Wn. App. 657, 661 n.4, 111 P.3d 1258 (2005).

Under RCW 64.34.304(1)(d) of the Washington Condominium Act, a unit owners' association may "[i]nstitute, defend, or intervene in litigation or administrative proceedings in its own name *on behalf of itself* or two or more unit owners on matters affecting the condominium."[7] But in order for a unit owners' association to bring a claim on its own behalf, it must prove that it has standing independent from the unit owners.[8]

"The doctrine of standing prohibits a litigant from raising another's legal rights."[9] A party has standing if it demonstrates that it has "'a present, substantial interest'" and that it will accrue a benefit by the relief granted.[10]

In Satomi Owners Association v. Satomi, LLC, the supreme court addressed a condominium owners' association's standing to bring claims on its own behalf against a developer and subcontractors.[11] The court looked to whether the association alleged damage to any property in which it had a "protectable interest" to determine whether it had standing independent from the unit owners.[12]

---

[7] (Emphasis added.)

[8] See Satomi Owners Ass'n v. Satomi, LLC, 167 Wn.2d 781, 812, 225 P.3d 213 (2009).

[9] Haberman v. Wash. Pub. Power Supply Sys., 109 Wn.2d 107, 138, 744 P.2d 1032 (1987), opinion amended by 109 Wn.2d 107, 750 P.2d 254 (1988).

[10] Timberlane Homeowners Ass'n, Inc. v. Brame, 79 Wn. App. 303, 307-08, 901 P.2d 1074 (1995) (quoting Primark, Inc. v. Burien Gardens Assocs., 63 Wn. App. 900, 907, 823 P.2d 1116 (1992)).

[11] 167 Wn.2d 781, 811-13, 225 P.3d 213 (2009).

[12] Id. at 812.

The association asserted five claims on its own behalf under RCW 64.34.304(1)(d).[13] It further alleged that the damages included "the cost of repairing the project . . . and resulting monetary and material harm."[14] The "project" involved individual units, common elements, and limited common elements.[15]

The court concluded that the association lacked standing to bring the five claims on its own behalf because it did not have a "protectable interest" in the property that was allegedly damaged.[16] Specifically, it did not own the units or the common elements that were allegedly damaged.[17] "Common elements" are "all portions of a condominium other than the units."[18]

Here, the COA brought two claims against Marx/Okubo: negligent misrepresentation and professional negligence. In its third amended complaint, it alleged that the damage it suffered included "the cost of repairing the damage to the Project caused by defective workmanship and materials and related costs, the cost of correcting defective conditions and related costs, consequential damages, the loss of use, stigma damages, investigation costs and litigation expenses."

---

[13] Id. at 811, 812 n.24.

[14] Id. at 811-12 (internal quotation marks omitted).

[15] Id. at 812.

[16] Id.

[17] Id.

[18] RCW 64.34.020(7).

To demonstrate that the Association has independent standing, the COA must show that the Association has a protectable interest in the property that was allegedly damaged. Here, the COA contends that the Association has a protectable interest in Madera West's common elements and in the reserve account. But under Satomi, the Association does not have a protectable interest in this property.[19]

First, like Satomi, the Association does not have a "protectable interest" in Madera West's common elements because they are owned by the unit owners, not the Association.[20]

Second, the Association does not have a "protectable interest" in the reserve account. A unit owners' association may establish a "reserve account" to "fund major maintenance, repair, and replacement of common elements."[21] As Marx/Okubo argues, the Association may "[e]stablish and administer a reserve account" for the benefit of the common elements.[22] But the Association itself does not receive a benefit from administering the reserve account.[23] As with the

---

[19] Satomi, 167 Wn.2d at 812.

[20] Id.

[21] RCW 64.34.380(1).

[22] RCW 64.34.304(1)(p); RCW 64.34.380.

[23] See, e.g., RCW 64.34.356 ("Unless otherwise provided in the declaration, any surplus funds of the association remaining after payment of or provision for common expenses and any prepayment of reserves shall, in the discretion of the board of directors, either be paid to the unit owners in proportion to their common expense liabilities or credited to them to reduce their future common expense assessments.").

"common elements" in Satomi, the Association does not have "protectable interest" in the reserve account.[24]

Since the Association did not have a "protectable interest" in the common elements or reserve account, the trial court properly decided that the Association did not have standing independent from the unit owners.

The COA argues that the Association had *some* property interest in the common elements and reserve account.[25] But under Satomi, the issue is whether the Association had a "protectable interest" in this property.[26] Whatever interest the Association may have in this property does not rise to the level of a "protectable interest" under Satomi.[27] Further, the COA fails to demonstrate how the Association would benefit from any relief granted.[28] Thus, we reject this argument.

*The Association's Standing on Behalf of Unit Owners*

The prior discussion does not end our inquiry. The COA also argues that even if the Association does not have standing independent of the unit owners "at the very least it has standing to sue on behalf of the individual owners." We agree.

---

[24] Satomi, 167 Wn.2d at 812.

[25] Reply Brief of Appellant at 20-21 (citing Affiliated FM Ins. Co. v. LTK Consulting Services, Inc., 170 Wn.2d 442, 457-58, 243 P.3d 521 (2010)).

[26] Satomi, 167 Wn.2d at 812.

[27] Id.

[28] See Timberlane Homeowners Ass'n, Inc., 79 Wn. App. at 307-08.

As we noted previously, under RCW 64.34.304(1)(d), a unit owners' association may "[i]nstitute, defend, or intervene in litigation or administrative proceedings in its own name on behalf of itself or **two or more unit owners on matters affecting the condominium.**"[29]

As discussed above, in Satomi, the supreme court concluded that the condominium association did not have standing to bring five claims on its own behalf.[30] Instead, the court found that the claims were "brought solely in a representative capacity by Blakeley Association on behalf of its members who own the allegedly damaged property."[31]

Similarly, here, the Association has standing to bring claims on behalf of "two or more unit owners" of property that was allegedly damaged. Thus, the trial court erred to the extent it dismissed the Association's claims made on behalf of "unit owners on matters affecting the condominium."

## PROFESSIONAL NEGLIGENCE

The COA argues that the trial court erred when it granted Marx/Okubo's motion for summary judgment. The trial court dismissed the COA's negligent misrepresentation as well as its professional negligence claims against Marx/Okubo.[32]

---

[29] (Emphasis added.)

[30] Satomi, 167 Wn.2d at 812.

[31] Id.

[32] Clerk's Papers (No. 68127-3) at 1640-41.

Significantly, on appeal, the COA only challenges the dismissal of the professional negligence claim, effectively abandoning the negligent misrepresentation claim made below.[33] For example, in its appellate briefing, the COA argues both a statutory and common law duty "to act with 'reasonable care and competence.'"[34] This is a statement of a duty regarding professional negligence, not negligent misrepresentation. In addition, the COA expressly distinguishes Marx/Okubo's cited case authority on the following basis: "[N]either issue [in that case] was considered under the rubric of a professional negligence claim. The claim at issue was for negligent misrepresentation."[35] This shows the COA's reliance on the professional negligence claim asserted below, not the negligent misrepresentation claim.

Additionally, nowhere in its opening brief is there any discussion of or citation to the Restatement (Second) of Torts § 552, which was the basis for the COA's negligent misrepresentation claim below. This further demonstrates the abandonment of this claim on appeal.

Thus, the sole question now before us is whether the trial court properly dismissed the COA's professional negligence claim on the basis that Marx/Okubo did not owe either a statutory or common law duty to the COA. More specifically, given the discussion regarding standing, the issue is whether Marx/Okubo owed a duty to individual condominium unit owners.

---

[33] Brief of Appellant at 11-19.

[34] Id. at 11 (quoting WAC 308-12-321(1)).

[35] Id. at 18.

To prevail on a negligence claim, a plaintiff must prove duty, breach, causation, and injury.[36] "Duty in a negligence action is a threshold question."[37] To determine whether the law imposes a duty and what the measure and scope of that duty are, a court weighs "considerations of 'logic, common sense, justice, policy, and precedent.'"[38] "A duty may be predicated 'on violation of statute or of common law principles of negligence.'"[39]

The existence of a duty is a question of law.[40] The plaintiff has the burden of establishing both the existence and scope of a duty.[41]

*Statutory Duty*

The COA argues that chapter 18.43 RCW, chapter 18.08 RCW, WAC 196-27A-020, and WAC 308-12-330 establish that Marx/Okubo owed it a duty of care when it was performing engineering and architectural services. We disagree.

"To determine whether a duty of care exists based upon a statutory violation [the supreme court] has adopted the Restatement test, which, among

---

[36] Keller v. City of Spokane, 146 Wn.2d 237, 242, 44 P.3d 845 (2002).

[37] Jackson v. City of Seattle, 158 Wn. App. 647, 651, 244 P.3d 425 (2010).

[38] Affiliated FM Ins. Co., 170 Wn.2d at 449 (internal quotation marks omitted) (quoting Snyder v. Med. Serv. Corp. of E. Wash., 145 Wn.2d 233, 243, 35 P.3d 1158 (2001)).

[39] Jackson, 158 Wn. App. at 651-52 (quoting Burg v. Shannon & Wilson, Inc., 110 Wn. App. 798, 804, 43 P.3d 526 (2002)).

[40] Schooley v. Pinch's Deli Market, Inc., 134 Wn.2d 468, 474, 951 P.2d 749 (1998).

[41] Id. at 475.

other things, requires that the injured person be within the class of persons the statute was enacted to protect."[42] To determine whether a plaintiff is a member of a protected class, a court looks to the language of the statute.[43] "Only after the court defines the protected class will the jury then determine whether the injury to the plaintiff was foreseeable."[44]

Under WAC 196-27A-020, registered engineers "are to safeguard life, health, and property and promote the welfare of the public." "To that end, registrants have obligations to the public, their employers and clients, other registrants and the board."[45]

WAC 308-12-330(1)(a)[46] provides that "[w]hen practicing architecture, you must act with reasonable care and competence, and must apply the technical knowledge and skill which is ordinarily applied by architects of good standing, practicing in the same locality."

In Burg v. Shannon & Wilson, Inc., this court considered whether chapter 18.43 RCW and former WAC 196-27 (2001) imposed a duty on S & W, an engineering firm.[47] There, the trial court summarily dismissed the appellant

---

[42] Id. at 474-75.

[43] Id. at 475.

[44] Id. at 475 n.3.

[45] WAC 196-27A-020.

[46] As Marx/Okubo notes, the COA cites WAC 308-12-321(1) in its brief, but this particular section is no longer in effect. It appears that the COA meant to cite WAC 308-12-330.

[47] 110 Wn. App. 798, 804-07, 43 P.3d 526 (2002).

14

homeowners' negligence claim on the basis that S & W did not owe a duty to the homeowners.[48] This court explained that the statutes and regulations "indicate that professional engineers owe duties to the public, to their clients and to their employers."[49]

But this court noted, "The broad pronouncements that engineers owe a general duty to the public welfare alone do not establish that engineers owe a duty to any identifiable group or individual."[50] This court concluded that the "[a]ppellants [had] not met their burden of articulating how these statutes and regulations impose a duty on S & W specific to them individually" and concluded that summary judgment was appropriate.[51]

Here, we reach the same conclusion. The COA has not met its burden in articulating how the broad pronouncements in chapter 18.43 RCW and WAC 196-27A-020, which relates to engineers, impose a duty that Marx/Okubo owed to the unit owners. Like Burg, the unit owners were neither Marx/Okubo's client nor employer at the time it completed its work. A.F. Evans was Marx/Okubo's client. When Marx/Okubo entered into its agreement with A.F. Evans to inspect the property and produce its reports, the Association was neither the client nor the employer of the firm. Moreover, the purchase of the Apartments and the ensuing conversion to condominiums had not occurred. Under these

---

[48] Id. at 803.

[49] Id. at 807.

[50] Id.

[51] Id.

circumstances, there is simply no showing of any duty owed under the statutory and regulatory provisions on which the COA relies.

The COA attempts to distinguish Burg from the present case. But its arguments are not persuasive.

First, it contends that Marx/Okubo created a report that was "specifically prepared for reliance on by [the unit owners], making them akin to a client." But as discussed above, at the time Marx/Okubo entered into an agreement with A.F. Evans, no person had purchased a condominium unit and the COA did not exist. Considering these facts, the argument that the unit owners were akin to clients is not persuasive.

Second, the COA contends that chapter 18.43 RCW "applies to engineers providing private services." It provides no further argument. Accordingly, we do not further consider this claim.

Similarly, the COA does not explain why it falls within the protected class under WAC 308-12-330(1)(a). Mere citation to this regulation without any legal argument does not warrant our further consideration of this claim.[52]

In sum, the COA failed to meet its burden in establishing that the unit owners were within the scope of any statutory or regulatory duty imposed on Marx/Okubo.

---

[52] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

*Common Law Duty*

The COA next argues that the common law establishes that Marx/Okubo owed the unit owners a professional's duty of care when it performed its services. We hold that the COA has failed in its burden to show the firm owed any common law duty for professional negligence to it.

"'Whether a defendant owes a duty of care to the complaining party is a question of law.'"[53] We review such questions de novo.[54] Further, we may affirm an order granting summary judgment on any basis supported by the record.[55]

In its attempt to show a duty under its professional negligence claim, the COA relies on two cases: Affiliated FM Insurance Co. v. LTK Consulting Services, Inc.[56] and G.W. Construction Corp. v. Professional Service Industries, Inc.[57] Neither case is helpful to establish that Marx/Okubo owed a duty to the COA.

In Affiliated, a fire on the Seattle Monorail caused millions of dollars in losses to Seattle Monorail Services (SMS), a company that had the exclusive concession to operate the Monorail System.[58] The insurer for SMS, as subrogee,

---

[53] Schaaf v. Highfield, 127 Wn.2d 17, 21-22, 896 P.2d 665 (1995) (quoting Hansen v. Friend, 118 Wn.2d 476, 479, 824 P.2d 483 (1992)).

[54] Sheikh v. Choe, 156 Wn.2d 441, 448, 128 P.3d 574 (2006).

[55] LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

[56] 170 Wn.2d 442, 243 P.3d 521 (2010).

[57] 70 Wn. App. 360, 853 P.2d 484 (1993).

[58] Affiliated, 170 Wn.2d at 443-44.

commenced a tort action against LTK Consulting Services, Inc., an engineering firm.[59] The insurer alleged that LTK suggested the design of an electrical grounding system that was allegedly at fault for causing the fire.[60] The supreme court stated the issue as "whether SMS, which does not own the Seattle Monorail, can bring a tort action against LTK."[61]

Six justices of a divided court held that the "engineers' common law duty of care has long been acknowledged in this state."[62] In the lead opinion, signed by two justices, the author cited this court's opinion in G.W. Construction Corp. v. Professional Service Industries, Inc.[63] There, this court held that "the defendant engineer performing an inspection under contract had an independent 'duty to exercise reasonable engineering skill and judgment.'"[64]

The lead opinion in Affiliated went on to state that a duty's scope involves a question of law.[65] It further stated that under the circumstances of that case "the scope of an engineer's duty of care extends to the persons who hold a legally protected interest in the damaged property."[66] Then, the lead opinion

---

[59] Id. at 443, 446.

[60] Id.

[61] Id. at 444.

[62] Id. at 454, 461, 463.

[63] Id. at 454 (citing G.W. Construction Corp., 70 Wn. App. at 366).

[64] Id. (quoting G.W. Construction Corp., 70 Wn. App. at 366).

[65] Id. at 455.

[66] Id. at 458.

stated that LTK Consulting, an engineering firm, owed a duty to SMS, even though the City of Seattle owned the monorail.[67] SMS, as an operator, had a property interest in the monorail.[68] Thus, SMS was within the scope of LTK's duty of care.[69]

Here, the essence of the professional negligence claim that the COA made below is that Marx/Okubo "fail[ed] to provide owners with all relevant information in its reports, which they knew were prepared as a disclosure of the existing condition of the [condominium] Project."[70] By its plain terms, this claim could serve as grounds for a negligent misrepresentation claim based on the Restatement (Second) of Torts § 552.[71] But, as we have already discussed, the COA has abandoned this claim on appeal.

To establish a negligent misrepresentation claim, the plaintiff must prove that the defendant "'supplie[d] false information for the guidance of others in their

---

[67] Id. at 460.

[68] Id.

[69] Id.

[70] Plaintiff's *Third Amended* Complaint, Clerk's Papers (No. 68127-3) at 715.

[71] See Restatement (Second) of Torts § 552(1) (2012) ("One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.").

19

business transactions.'"[72] Failure to disclose information can serve as a basis for negligent misrepresentation where one party in a business transaction has information "'necessary to prevent his partial or ambiguous statement of the facts from being misleading.'"[73] Here, the COA asserts that Marx/Okubo reported that approximately one-third of the LP siding was damaged in 1996. But in 2005, Marx/Okubo reported that there were only "isolated" areas of damage in the same siding. Further, Marx/Okubo failed to disclose that the siding was LP siding and known to be defective. Finally, it alleges that the "monumental disparity" between the 1996 report and 2005 report led to an inaccurate reserve study.

The COA fails to point to anything in the summary judgment record to show the reports were allegedly defective for any reason other than alleged false statements and failure to disclose information. In short, there is nothing here to show any professional negligence, as distinct from a negligent misrepresentation.

As far as we can see, neither the statement of the duties nor the scope of the duties is the same for these two distinct claims. Yet, in discussing these concepts, the COA argued below that it was damaged by reliance on "Okubo's negligent reports."[74] The COA fails to point to anything in this record to explain

---

[72] ESCA Corp. v. KPMG Peat Marwick, 135 Wn.2d 820, 826, 959 P.2d 651 (1998) (quoting Restatement (Second) of Torts § 552(1) (1977)).

[73] Colonial Imports, Inc. v. Carlton Nw., Inc., 121 Wn.2d 726, 731, 853 P.2d 913 (1993) (quoting Restatement (Second) of Torts § 551(2)(b) (1977)).

[74] Plaintiff's Motion for Partial Summary Judgment, Clerk's Papers (No. 68127-3) at 1093.

that these reports are "negligent" because they breach a professional duty owed rather than a duty not to negligently misrepresent something. Nor can we find in this record any explanation why the COA is within the scope of the duty owed by this professional firm for the professional negligence claim.

These are not mere technicalities. To the extent the COA seeks to rely on Affiliated, where the tort claim appears to have been one for professional negligence, not negligent misrepresentation, these failings are critical. Specifically, this case is essentially a case based on negligent misrepresentation, not professional negligence. Thus, there is no basis to rely on the lead opinion in Affiliated, a professional negligence case.[75] That case is distinguishable.

G.W. Construction Corp. is also distinguishable. There, a subcontractor sued a building inspector for failing to detect misplaced rebar during its inspection.[76] The first issue was whether the subcontractor's claim sounded in contract or in tort.[77] This court concluded that the subcontractor's claim sounded only in tort and the tort statute of limitations applied.[78] It explained that the inspector had a "duty to exercise reasonable engineering skill and judgment" in its performance of its contractual obligation.[79] Although this court did not explicitly discuss the scope of this duty, it was clear that the inspector owed a

---

[75] Affiliated, 170 Wn.2d at 446.

[76] G.W. Const. Corp., 70 Wn. App. at 363.

[77] Id. at 364.

[78] Id. at 366.

[79] Id.

duty of care to the subcontractor because they were both parties to the contract.[80]

In contrast, Marx/Okubo's contract was with A.F. Evans, not the COA. Thus, G.W. Construction Corp. does not support the assertion that Marx/Okubo owed any duty to the COA. It is not helpful.

In sum, the COA failed to meet its burden in establishing that Marx/Okubo owed any common law duty for professional negligence to it.

## EVIDENTIARY RULING

The COA argues that the trial court erred when it denied the COA's motion to strike Hart's declaration. While admitting that this evidence was not submitted in support of Marx/Okubo's motion for summary judgment, the COA makes this argument "to the extent [Marx/Okubo] argues it should be considered in support of [its] opposition" to the COA's motion for summary judgment.

The declaration is not among the listed items the trial court considered in granting summary judgment. Because the declaration plays no part in the decision under review, we decline to address this contention.

## SANCTIONS

### CR 11

Marx/Okubo contends that the trial court abused its discretion when it denied its request for sanctions under CR 11. Specifically, it asserts that a number of plaintiffs testified that they did not review or reviewed but did not rely on Marx/Okubo's property assessment or reserve study. It argues that these

---

[80] Id. at 362, 365.

plaintiffs knew prior to filing their third amended complaint that they could not establish the reliance element of their negligent misrepresentation claims. We disagree.

Under CR 11, a court may impose sanctions if pleadings are filed for an improper purpose or without a basis in law or fact.[81] "The burden is on the movant to justify the request for sanctions."[82]

This court reviews the trial court's CR 11 ruling for abuse of discretion.[83] "A trial court abuses its discretion when its order is manifestly unreasonable or based on untenable grounds."[84] When a trial court denies a party's motion to impose sanctions, it need not enter findings.[85]

Washington courts have recognized that CR 11 sanctions can have a "potential chilling effect."[86] Thus, "the trial court should impose sanctions only when it is patently clear that a claim has absolutely no chance of success."[87]

---

[81] Biggs v. Vail, 124 Wn.2d 193, 201, 876 P.2d 448 (1994) (citing CR 11).

[82] Id. at 202.

[83] Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 338, 858 P.2d 1054 (1993).

[84] Id. at 339.

[85] Skimming v. Boxer, 119 Wn. App. 748, 755, 82 P.3d 707 (2004).

[86] Bryant v. Joseph Tree, Inc., 119 Wn.2d 210, 219, 829 P.2d 1099 (1992); see also Skimming, 119 Wn. App. at 755.

[87] Skimming, 119 Wn. App. at 755.

"The fact that a complaint does not prevail on its merits is by no means dispositive of the question of CR 11 sanctions."[88]

To establish a negligent misrepresentation claim, a plaintiff must allege the following:

> (1) the defendant supplied information for the guidance of others in their business transactions that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, *(4) the plaintiff relied on the false information*, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages.[89]

Here, Marx/Okubo argues that the COA's negligent misrepresentation claim was without a factual basis. It explains that 14 unit owners admitted in their interrogatory responses that they did not "review or rely" on Marx/Okubo's property assessment and reserve study. It also contends that 10 unit owners admitted the same in their depositions.

But Marx/Okubo's interrogatory and deposition questions focused on whether the unit owners *read* these reports. The interrogatory questions asked the unit owners if they had "read the Okubo Report" and if they had "read the Reserve Study." The questions at the unit owners' depositions often related to whether the unit owners remembered when they read the reports and if they could recall specific report provisions.

---

[88] Bryant, 119 Wn.2d at 220.

[89] Bloor v. Fritz, 143 Wn. App. 718, 734, 180 P.3d 805 (2008) (emphasis added) (citing Lawyers Title Ins. Corp. v. Baik, 147 Wn.2d 536, 545, 55 P.3d 619 (2002) (citing Restatement (Second) of Torts § 552(1) (1977)).

In the interrogatory questions, Marx/Okubo also asked the unit owners if they "relied upon information supplied by Marx/Okubo that was false." Almost all of the responses included in the record show that the unit owners answered "yes" to this question. Further, the unit owners testified that a Madera West representative reviewed the public offering statement with them and gave them copies before they purchased their condominium units. The public offering statement included Marx/Okubo's reports.

To establish a claim for negligent misrepresentation, a plaintiff must allege that it *relied* on false information provided by the defendant.[90] Reliance does not necessarily require that the unit owners *read* these reports. Though the COA did not prevail on the merits of its negligent misrepresentation claim, the COA's claim was grounded in *some* facts. Thus, the trial court did not abuse its discretion in denying Marx/Okubo's request for CR 11 sanctions.

Marx/Okubo argues that the unit owners' testimony shows that they did not "directly rel[y] upon false statements made by Marx/Okubo" because many of the unit owners testified that they had not read one or both of the reports. It cites Schaaf v. Highfield to support its assertion that its negligent misrepresentation claim did not have a factual basis.[91] But Schaaf does not hold that a plaintiff

---

[90] See Bloor, 143 Wn. App. at 734.

[91] Reply Brief of Appellant Marx/Okubo, Ltd. at 11 (citing Schaaf v. Highfield, 127 Wn.2d 17, 30-31, 896 P.2d 665 (1995)).

must directly see or read a report in order to rely on it for the purposes of a negligent misrepresentation claim.[92]

There, John Schaaf brought a negligent misrepresentation claim against Paul Olson, a home appraiser.[93] He asserted that Olson failed to report that the roof on the home Schaaf bought needed to be repaired.[94] The supreme court concluded that summary dismissal of this claim was proper because Schaaf did not rely on the appraisal report "at all."[95] The court explained that Schaaf knew that the roof needed to be repaired before he bought the house and he did not see the appraiser's report until a year after he bought the house.[96]

In contrast, as discussed above, the COA presented some evidence to show that the unit owners relied to some extent on Marx/Okubo's reports even though they did not read them. Thus, this argument is not persuasive.

### CR 26(g)

Marx/Okubo next argues that the trial court abused its discretion when it denied its request for discovery sanctions. It contends that the trial court should have imposed sanctions because nine unit owners gave misleading or false responses to interrogatory questions. We disagree.

---

[92] See Schaaf, 127 Wn.2d at 30-31.

[93] Id. at 20.

[94] Id.

[95] Id. at 30.

[96] Id. at 30-31.

CR 26(g) is the discovery sanctions rule, and it is "aimed at reducing delaying tactics, procedural harassment and mounting legal costs."[97] This rule authorizes an award of attorney fees and costs if a party fails to comply with discovery rules:

> Rule 26(g) requires an attorney signing a discovery response to certify that the attorney has read the response and that after a reasonable inquiry believes it is (1) consistent with the discovery rules and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; (2) not interposed for any improper purpose such as to harass or cause unnecessary delay or needless increase in the cost of litigation; and (3) not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had, the amount in controversy, and the importance of the issues at stake in the litigation.[98]

If a court determines that CR 26(g) was violated, the rule requires the imposition of sanctions.[99]

This court reviews a trial court's discovery sanctions for abuse of discretion.[100] "'A trial court abuses its discretion when its order is manifestly

---

[97] Fisons, 122 Wn.2d at 341.

[98] Id. at 343.

[99] See CR 26(g) ("If a certification is made in violation of the rule, the court, upon motion or upon its own initiative, *shall* impose upon the person who made the certification, the party on whose behalf the request, response, or objection is made, or both, an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney fee.") (emphasis added); see also Clipse v. State, 61 Wn. App. 94, 99, 808 P.2d 777 (1991) ("Although the nature of the sanction is a matter of judicial discretion, the rule mandates imposing sanctions if they are appropriate under the rule.").

[100] Magana v. Hyundai Motor Am., 167 Wn.2d 570, 582, 220 P.3d 191 (2009).

unreasonable or based on untenable grounds.'"[101]

> "A discretionary decision rests on 'untenable grounds' or is based on 'untenable reasons' if the trial court relies on unsupported facts or applies the wrong legal standard; the court's decision is 'manifestly unreasonable' if 'the court, despite applying the correct legal standard' to the supported facts, adopts a view 'that no reasonable person would take.'"[102]

In Clipse v. State, this court considered whether the "Designation of Plaintiff's Expert Witnesses" was "inaccurate, misleading, and not reasonable under the circumstances."[103] After comparing the designation with the witnesses' deposition testimony, this court concluded that the designation was misleading.[104] Contrary to the designation, three of the four presumed expert witnesses testified that they were not familiar with the case.[105] This court explained that the misleading disclosures caused "unnecessary expenditures of time and money."[106]

Here, Marx/Okubo argues that nine unit owners gave misleading or false responses to interrogatories when their responses are compared to their deposition testimony. For five of the nine unit owners, Marx/Okubo focuses on the interrogatory response that the unit owners' relied on information provided by

---

[101] Id. (quoting Fisons, 122 Wn.2d at 339).

[102] Id. at 583 (quoting Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006)) (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

[103] 61 Wn. App. 94, 99, 808 P.2d 777 (1991).

[104] Id. at 102.

[105] Id. at 99-101.

[106] Id. at 102.

Marx/Okubo.[107] For the remaining four unit owners, Marx/Okubo focuses on their interrogatory responses regarding whether they read the reports.[108] Thus, we examine this testimony based on these two interrogatory responses.

*Testimony Regarding Reliance*

In their interrogatory responses, Allan Fuller, Diana Crettol, Jayne Miller, Jonathan Jones, and Michelle Donaldson testified that they relied on information supplied by Marx/Okubo that was false. At their depositions, Marx/Okubo's questioning focused on when and if they read Marx/Okubo's reports and the specific provisions in the report that they relied on. But, as we noted above, these are different questions than whether the unit owners believed they generally relied on information provided by Marx/Okubo. Thus, these unit owners did not provide misleading or false interrogatory responses. They provided answers to more specific questions during their depositions.

The one exception appears to be Crettol. In her interrogatory response, she testified that she did not receive a copy of the property assessment or reserve study, but she did receive a "Replacement Reserve Estimate," which she

---

[107] Brief of Appellant Marx/Okubo, Ltd. at 22-27; see Clerk's Papers (No. 68522-8) at 580, 589, 621, 650, 678 (One interrogatory stated, "Do you contend you relied upon information supplied by Marx/Okubo that was false?").

[108] Brief of Appellant Marx/Okubo, Ltd. at 27-33; see Clerk's Papers (No. 68522-8) at 694-95, 708-09, 719-20, 732-33 (One interrogatory stated, "Did you read the Okubo Report referred to in your Second Amended Complaint prior to the date identified in your response to Interrogatory No. [8 or 11]?" Another interrogatory stated, "Did you read the Reserve Study referred to in your Second Amended Complaint prior to the date identified in your response to Interrogatory No. [8 or 11]?" Interrogatory No. 8 for some and No. 11 for others provided, "State the date upon which you acquired an ownership interest in a home in the Madera West Condominiums.").

later discovered was prepared by Phillips Real Estate Services, not Marx/Okubo. At her deposition, she testified that she relied on the estimate but not the property assessment or reports. She explained that she must have misunderstood the interrogatory. Considering this misunderstanding and her explanation, her testimony remained consistent.

In sum, the trial court did not abuse its discretion in determining that the interrogatory responses regarding the unit owners' reliance were not misleading or false.

*Testimony Regarding the Reports*

In their interrogatory responses, Rosie White and Thomas Fassler testified that they read both the property assessment and reserve study before taking an ownership interest in their condominium unit.

At White's deposition, she clarified that she skimmed the reports sometime after her purchase while she was at home, not in the Madera West office. As the COA points out, Marx/Okubo was asking White two different questions. In the interrogatory, Marx/Okubo asked White if she reviewed the documents before taking an ownership interest in her condominium. At the deposition, White testified that she read the reports after the "purchase." It is not clear whether "purchase" meant after she signed the purchase agreement but before she took ownership. Since Marx/Okubo was asking two different questions, White's interrogatory response was not misleading or false.

During Fassler's deposition, he testified that he was not able to remember when he reviewed these reports or details from these reports. But he testified that he remembered that a sales agent had showed him the reserve study. He

also testified that he remembered that the property assessment mentioned siding. While Fassler could not remember many details about the report, his deposition testimony showed that he "read" the reports to some extent.

Ryan Fidler testified in his interrogatory response that he read only the reserve study before taking an ownership interest. During his deposition, he testified that he did not see the Marx/Okubo reserve study before purchasing his unit. When asked why his interrogatory response stated that he had read the reserve study, he explained that he thought the interrogatory was referring to a reserve study conducted by Madera West, which was posted on a community board. Considering this misunderstanding, Fidler's testimony remained consistent.

Finally, Scott Perry testified in his interrogatory response that he only read the property assessment. During his deposition, he testified that he could not recall whether he read the property assessment. When asked why his interrogatory response stated that he read the report, he responded:

> A. I thought I did. Maybe I didn't. There have been so many documents sent out and it's all gobbledegook to be honest with you. It's a—it's a nightmare lawsuit.
>
> . . .
>
> A. I can't recall reading that. I'm sorry I misrepresented that.
>
> . . .
>
> A. I probably went though this too quickly. Just aggravated that I'm in this situation that I'm in right now with people not following through doing what they're supposed to do. I think that's probably why I said yeah I must have read it.[109]

---

[109] Clerk's Papers (No. 68522-8) at 726, 729.

Perry's deposition testimony is the only example where his testimony directly contradicts his interrogatory response. But given Perry's confusion regarding the numerous documents, the trial court did not abuse its discretion when it denied Marx/Okubo's request for CR 26(g) sanctions for Perry and the other unit owners' interrogatory responses.

Marx/Okubo argues that the "fact that the certification rule was violated is so clear from the evidence presented that the trial court must have applied an incorrect legal standard."[110] But under Clipse, which Marx/Okubo cited to support its request for sanctions, the "standard" or "issue" was whether the discovery document contained misleading information that led to unnecessary expenditures of time and money.[111] As explained above, the trial court did not abuse its discretion in determining that the interrogatory responses were not misleading when compared with the deposition testimony. Thus, this argument is not persuasive.

Marx/Okubo contends that "counsel nor the judiciary should turn a blind eye" to false discovery responses "even when sought to be justified by stress, emotion, or confusion." But looking at the interrogatory responses and the deposition testimony as a whole, the responses were not misleading or false. In two instances, there was some confusion about the documents that the interrogatory referenced, but their testimony was fairly consistent when their misunderstanding was revealed.

---

[110] Brief of Appellant Marx/Okubo, Ltd. at 36.

[111] Clipse, 61 Wn. App. at 102.

In sum, the trial court did not abuse its discretion in denying Marx/Okubo's request for CR 26(g) sanctions.

## ATTORNEY FEES

Marx/Okubo argues that it is entitled to an award of attorney fees against the COA. It bases its argument on RCW 4.84.330 and the attorney fees provision in the contract between A.F. Evans and Marx/Okubo. We hold that Marx/Okubo is not entitled to an award of its reasonable fees against the COA based on this contract.

"Under the American rule compensation for attorney fees and costs may be awarded only if authorized by contract, statute, or a recognized ground in equity."[112] Whether an award of fees is authorized is a question of law that this court reviews de novo.[113]

With regard to whether a contract provision authorizes attorney fees and costs, RCW 4.84.330 provides:

> In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he or she is the party specified in the contract or lease or not, shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements.

A threshold issue that neither party addresses is whether the COA is liable for fees based on a contract to which it is not a party.

---

[112] In re Impoundment of Chevrolet Truck, WA License No. A00125A v. Wash. State Patrol, 148 Wn.2d 145, 160, 60 P.3d 53 (2002).

[113] Boguch v. Landover Corp., 153 Wn. App. 595, 615, 224 P.3d 795 (2009).

Marx/Okubo fails to cite any persuasive authority that this attorney fees

provision between it and A.F. Evans applies to the COA. The contractual

provision states:

> The substantially prevailing party in any arbitration, or other final
> binding dispute proceeding upon which the parties may agree, shall
> be entitled to recover from the other party all costs and expenses
> incurred by that party in participating in the arbitration, including
> reasonable attorneys' fees.[114]

Nothing in the above contractual provision's wording evidences an intent

by the parties to the contract to confer on any third-party the right to fees.

Moreover, Marx/Okubo fails to point to any other contractual provision to support

the conclusion that the COA is an intended beneficiary of the contract containing

this provision for fees.

We also note a point that neither party addresses. The language of the

fee provision refers to "any arbitration, or other final binding dispute proceeding

upon which the parties may agree," not litigation in court.[115]

Nevertheless, Marx/Okubo asserts that an attorney fees provision in a

contract can be imposed on a person who is not a party to that contract. But

most of the cases Marx/Okubo cites illustrate circumstances where the party

seeking attorney fees under a contract provision was a party to that contract.[116]

---

[114] Clerk's Papers (No. 68522-8) at 131.

[115] Id.

[116] Brief of Marx/Okubo, Ltd, at 10-11 (citing Eastwood v. Horse Harbor Found., Inc., 170 Wn.2d 380, 401-02, 241 P.3d 1256 (2010); Brown v. Johnson, 109 Wn. App. 56, 58, 34 P.3d 1233 (2001); Edmonds v. John L. Scott Real Estate, Inc., 87 Wn. App. 834, 855-56, 942 P.2d 1072 (1997); Western Stud Welding, Inc. v. Omark Indus., Inc., 43 Wn. App. 293, 299, 716 P.2d 959 (1986)).

The only case that discusses the award of fees where the recovering party was not a party to a contract is Deep Water Brewing, LLC v. Fairway Resources, Ltd.[117] But that case does not support Marx/Okubo's broad assertion.

There, Division Three concluded that the trial court properly awarded attorney fees to the Kenagys.[118] The Kenagys bought a restaurant with a lake view from the Ahlquists.[119] The Ahlquists had entered into an easement agreement and a right-of-way agreement with developers to preserve the restaurant's view.[120] These latter agreements contained attorney fees provisions.[121] Division Three explained that the Kenagys were not third party beneficiaries to the agreements "but nonetheless [could] enforce the agreements (with attorney fees provisions) as running covenants protecting the view from their restaurant."[122]

That is not the case here. There are no running covenants involved in this case. Rather, Marx/Okubo relies on a provision in an agreement to which the COA is not a party. There simply is no authority under these circumstances to impose on the COA the burden of a contractual provision for attorney fees where

---

[117] Id. (citing Deep Water Brewing, LLC v. Fairway Res., Ltd., 152 Wn. App. 229, 215 P.3d 990 (2009)).

[118] Deep Water Brewing, 152 Wn. App. at 279.

[119] Id. at 241.

[120] Id. at 239-40.

[121] Id. at 245-46.

[122] Id. at 278.

it is neither a party to the contract nor an intended third-party beneficiary of that contract.

Marx/Okubo avoids the threshold issue that we have discussed and analyzes instead whether the contract was central to the COA's claims. This is incorrect. The initial focus should be on whether the attorney fees provision in this agreement between Marx/Okubo and A.F. Evans extends to the COA.[123] Because Marx/Okubo has cited no controlling authority to support its position, we presume it has found none.[124]

Even if Marx/Okubo could assert a fees provision against the COA, the COA's claims in this case were not "on the contract" as required by RCW 4.84.330.

"If an action in tort is based on a contract containing an attorney fee provision, the prevailing party is entitled to attorney fees."[125] An action is "on a contract" if (1) "the action arose out of the contract," and (2) "if the contract is central to the dispute."[126]

In Boguch v. Landover Corp., this court held that "[i]f a party alleges breach of a duty imposed by an external source, such as a statute or the

---

[123] See id.

[124] State v. Young, 89 Wn.2d 613, 625, 574 P.2d 1171 (1978).

[125] Brown, 109 Wn. App. at 58.

[126] Id.

common law, the party does not bring an action on the contract, even if the duty would not exist in the absence of a contractual relationship."[127]

There, Boguch brought breach of contract and negligence claims against real estate brokerage firms and two realtors.[128] The trial court concluded that the realtors were entitled to summary judgment as a matter of law and awarded them attorney fees and costs.[129] On review, this court concluded that the realtors were not entitled to an award for defending against Boguch's tort claims.[130] This court explained that Boguch's negligence claims were not "on the contract":

> A realtor has a common law and a statutory duty to exercise reasonable care in representing a seller's interest. RCW 18.86.030(1), .040(1), .110. This duty exists regardless of any contractual provision. The determination of whether [the realtors] breached this duty does not require examination of the listing agreement, making the contract ancillary to the dispute. The contractual relationship may have given rise to the Realtors' duties to Boguch, but their duties are defined by the common law and by statute, not by the contract.[131]

Thus, this court determined that the trial court erred in awarding fees for defending the tort claims based on a contractual provision.[132]

Here, the same conclusion is appropriate. The COA's negligent misrepresentation and professional negligence claims were not "on the contract."

---

[127] 153 Wn. App. 595, 615, 224 P.3d 795 (2009).

[128] Id. at 601-03.

[129] Id. at 606-07.

[130] Id. at 619.

[131] Id.

[132] Id.

While the contractual relationship between Marx/Okubo and A.F. Evans may have given rise to the claims, these claims were based on common law and statute, not on the contract. Thus, the trial court properly determined that Marx/Okubo was not entitled to an award of fees for defending against the COA's tort claims.

Marx/Okubo argues that Boguch is not consistent with the supreme court's decision in Eastwood v. Horse Harbor Foundation.[133] But Eastwood is distinguishable from Boguch. In Eastwood, the supreme court determined that Horse Harbor Foundation had a contractual obligation under a lease and an independent tort duty to not cause waste.[134] The court granted Eastwood's request for fees because of an attorney fees provision in the lease *and* a statute that provided for an award in a waste action.[135] The court's award regarding the tort of waste appears to be based on a statute, not a contract provision.[136] Here, Marx/Okubo does not cite a statute to support its request for attorney fees and costs. Thus, Boguch controls this case.

Marx/Okubo also contends that Boguch is distinguishable because that case contained a narrower attorney fees provision than the provision here. While the provision's language in Boguch may have been narrower, this difference in

---

[133] 170 Wn.2d 380, 241 P.3d 1256 (2010)).

[134] Id.

[135] Id. at 401-02.

[136] Id.

language does not negate the overarching rule.[137] A party does not bring an action "on the contract" if the duty is "imposed by an external source, such as a statute or the common law."[138] Thus, this argument is not helpful.

Finally, Marx/Okubo argues that the doctrine of equitable estoppel supports its request for attorney fees and costs under the contract provision. But this argument is not persuasive.

Marx/Okubo cites Townsend v. Quadrant Corp. to support this argument.[139] This case is distinguishable.

There, the supreme court considered whether the children of homeowners were bound by arbitration clauses that were in the purchase and sale agreements that their parents entered into.[140] The court explained that the general rule is that "nonsignatories are not bound by arbitration clauses."[141] One exception to this rule is the principle of equitable estoppel.[142] "Equitable estoppel 'precludes a party from claiming the benefits of a contract while simultaneously

---

[137] See Boguch, 153 Wn. App. at 607 (explaining that the provision stated, "[i]n the event either party employs an attorney to enforce any terms of this Agreement and is successful, the other party agrees to pay reasonable attorneys' fees.") (alteration in original) (internal quotation marks omitted).

[138] Id. at 615.

[139] Brief of Appellant Marx/Okubo, Ltd. at 12-13 (citing Townsend v. Quadrant Corp., 173 Wn.2d 451, 268 P.3d 917 (2012)).

[140] Townsend, 173 Wn.2d at 460.

[141] Id.

[142] Id. at 461.

attempting to avoid the burdens that contract imposes.'"[143] The court further explained that "equitable estoppel may require a nonsignatory to arbitrate a claim if that person, despite never having signed the agreement, 'knowingly exploits' the contract in which the arbitration agreement is contained."[144]

The supreme court explained that two of the parents and children's claims "relat[ed] directly" to the purchase and sale agreement, "including an allegation of breach of warranty and a request for rescission."[145] Because the children were arguing that they received a benefit from the agreement, the children could not also avoid the arbitration clause within that agreement.[146]

In contrast, the COA's claims against Marx/Okubo did not directly relate to the contract between Marx/Okubo and A.F. Evans Development. The COA did not assert breach of contract claims against Marx/Okubo; it asserted negligent misrepresentation and professional negligence claims. Thus, the COA was not "knowingly exploiting the terms of the contract" because it was not basing its tort claims on the contract.[147]

Marx/Okubo contends that the COA "relied upon standard of care warranties contained in Marx/Okubo's contract with [A.F. Evans] to support their

---

[143] Id. (internal quotation marks omitted) (quoting Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1045-46 (9th Cir. 2009)).

[144] Id. (internal quotation marks omitted) (quoting Mundi, 555 F.3d at 1046).

[145] Id.

[146] Id. at 462.

[147] See id.

claims against Marx/Okubo." But the COA's reference to the contract's warranty was not a basis for its tort claims. In the COA's opposition to Marx/Okubo's motion for summary judgment, it stated:

> The only relevant part of the standard terms here, is Okubo's warranty that "[it would] perform its services for [Evans] within the accepted practices and procedures and [would] exercise that degree of care and skill ordinarily exercised under similar circumstances by members of its profession." In other words, Okubo warranted that it would not be negligent in carrying out the work in its proposal.[148]

The COA's response merely shows that Marx/Okubo made a warranty to A.F. Evans to use reasonable care. This response does not demonstrate that the COA's claims were grounded in the contract. As discussed above, the COA's tort claims were based on common law and statutes.

In sum, the doctrine of equitable estoppel does not support Marx/Okubo's argument.

Finally, Marx/Okubo argues that it is entitled to attorney fees on appeal because of the attorney fees provision in its contract with A.F. Evans and under RAP 18.1. Because Marx/Okubo is not entitled to fees under the contract provision, it is not entitled to fees on appeal.[149]

---

[148] Clerk's Papers (No. 68522-8) at 908 (alteration in original) (citation omitted).

[149] See, e.g., Gray v. Bourgette Const., LLC, 160 Wn. App. 334, 345, 249 P.3d 644 (2011) (granting attorney fees on appeal to a party because the trial court properly awarded attorney fees to that party).

We affirm the summary judgment orders and the denial of sanctions and attorney fees. We also deny fees on appeal.

_Cox, J._

WE CONCUR:

_Leach, C.J._        _Becker, J._