IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38878-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JACOB ZACHARIA DITE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J.P.T.* — Jacob Dite challenges his conviction for attempting to elude a police vehicle and the jury's finding of an endangerment aggravator.  He challenges the sufficiency of the evidence and, for the first time on appeal, objects to closing statements of the prosecutor that he argues are reversible misconduct.  His final challenge is related to his request, following the guilty verdicts, that the court impose the parenting sentencing alternative (PSA) authorized by RCW 9.94A.655.  He contends that the court's refusal to impose the alternative, without first requesting information on any

---

* Judge Laurel H. Siddoway was a member of the Court of Appeals at the time argument was held on this matter.  She is now serving as a judge pro tempore of the court pursuant to RCW 2.06.150.

history of his abusing or neglecting children as provided by RCW 9.94A.655(4), requires

resentencing.

Whatever the meaning of RCW 9.94A.655(4), any alleged error in following it is

subject to RAP 2.5(a). It is undesirable to resolve its meaning in this appeal, where the

alleged need for the request was never raised and the trial court had no opportunity to

address it.

For that reason and because the State's evidence was sufficient and the

complained-of statements by the prosecutor were not flagrant and ill intentioned, we

affirm.

FACTS AND PROCEDURAL BACKGROUND

Jacob Dite was charged with attempting to elude a police vehicle with an

endangerment aggravator, after his flight from a traffic stop was ended with a "PIT"

maneuver[1] and he was apprehended. Chewelah Police Officer James Glover had been on

patrol shortly after midnight one morning in March 2021, when he ran the license plate of

a Hyundai Elantra he saw in the parking lot of the Chewelah Casino. A male driver was

at the wheel. The Department of Licensing (DOL) return showed the vehicle was

registered to "Jacob Dite," who had a suspended driver's license. Officer Glover had a

clear view of the driver, who appeared to be Mr. Dite based on the driver's license photo

---

[1] "PIT" is an acronym for pursuit intervention technique.

returned from DOL.  Officer Glover decided to leave the parking lot, park on Highway

395, and watch to see if Mr. Dite drove away.

Officer Glover saw Mr. Dite drive out of the lot and travel north on Highway 395.

The officer followed and saw Mr. Dite turn left on Quarry Browns Lake Road.  The DOL

return had provided a Springdale address for Dite, so Officer Glover anticipated his route

and drove to Market Road, where he waited in a residential driveway.  When Mr. Dite

drove past, the officer activated his lights and initiated a traffic stop.

Mr. Dite pulled over, and Officer Glover reported the license plate and stop to

dispatch.  The officer then got out of his patrol car and walked toward the Hyundai, when

Mr. Dite suddenly "accelerated hard" and took off.  Rep. of Proc. (RP) at 82.  Officer

Glover jumped back into his patrol car and began pursuit with his lights and sirens

activated.

He followed the Elantra southbound on Farm to Market Road, toward Waitts

Lake.  During the pursuit, Officer Glover recorded Mr. Dite's speed using his radar,

clocking him at speeds of up to 80 and 85 m.p.h.  Mr. Dite slowed down some when

navigating turns, but always reaccelerated on straightaways.  The chase proceeded down

Farm to Market Road, right on Wrights Valley Road, left on Red Marble Road, a sharp

right onto Smola Road, and right onto Quarry Browns Lake Road.  The roads were

mostly dry and clear, but there was some snow and sand accumulation along roadsides.

Once on Quarry Browns Lake Road, Mr. Dite was heading east, back toward Highway 395, when he slammed on his brakes and took a sudden turn onto Bundy Road.

Mr. Dite sped back up to about 30 m.p.h. on the initial straight section of Bundy Road before entering the first corner. Rounding the corner, he encountered deer and slammed on his brakes. A collision was avoided, but Mr. Dite slid off the road into the shoulder. He recovered and returned to the road, regaining his speed as he continued north.

Bundy Road is a dead end and Mr. Dite soon reached the end of the pavement. He tried to turn around but ended up backing onto a snow berm. As Mr. Dite tried to rock his vehicle back and forth to dislodge it, Officer Glover engaged in the PIT maneuver, inching his patrol car forward until Mr. Dite's vehicle was pinned to the berm. Once pinned, Mr. Dite stopped trying to escape and threw his hands up.

Officer Glover approached and ordered Mr. Dite out of the car. He saw that Mr. Dite had a female passenger who turned out to be Santana Flett, Mr. Dite's girlfriend, with whom he has two children. Asked why he fled, Mr. Dite responded that he had an outstanding warrant for his arrest and hoped to get home to see his children before going to jail. He was mistaken about the warrant; there was none.

The State charged Mr. Dite with one count of driving while license suspended in the third degree and one count of attempting to elude a pursuing police vehicle with aggravating circumstances. The aggravating circumstance charged was that "one or more

4

persons other than the defendant or the pursuing law enforcement officer were threatened with physical injury or harm," as provided by RCW 9.94A.834(1). Clerk's Papers (CP) at 2.

At the trial of the charges, Officer Glover testified that during the pursuit, Mr. Dite reached speeds of 80 to 85 m.p.h. on roads posted at 40 m.p.h. Mr. Dite would slow down a bit and return to his proper lane to take corners, but would consistently move to the oncoming lane on the straightaways. Officer Glover testified that Mr. Dite was not making corners cleanly; he was skidding out. He testified that visibility for both drivers was limited during the pursuit for a couple of reasons: all they had to drive by was their headlights, and the ability to see around corners was limited by the topography. Most of the pursuit took place on curves, not straightaways.

On Mr. Dite's turn onto Smola Road, Officer Glover testified that Mr. Dite had to brake hard and the officer did not think he would make the turn because he was going so fast. Mr. Dite slid through the intersection at that point and "almost into the ditch." RP at 87. His turn onto Bundy Road was also "not controlled at all," according to Officer Glover, who described Mr. Dite as ending up far on the shoulder. RP at 88. Officer Glover testified that after being stopped, Mr. Dite told him he had been driving in the wrong lane of traffic all the time because he hoped that would make the officer stop chasing him.

5

Officer Glover testified to his emergency driving training, and the prosecutor questioned him about the danger presented by driving at high speeds. The officer testified that as speeds increase, less of the tire has contact with the roadway, so with higher speed, there is less traction, and "a lot less control." RP at 94. High speed also increases the danger of injury from an accident because of the increased blunt force trauma—"the faster you are going, anytime you hit something there's opposite energy that comes through." RP at 95.

Mr. Dite did not testify, but Ms. Flett, who the State argued was the "person[ ] other than the defendant or the pursuing law enforcement officer" who was threatened with physical injury or harm, was called as a defense witness. She said she had been aware that Mr. Dite had a suspended license, and she affirmed that he pulled over in response to Officer Glover's traffic stop but "took off" as the officer approached their car. RP at 144. She agreed that in the chase that followed, Mr. Dite drove in excess of the speed limit, but she estimated he only reached speeds of 60 m.p.h. She testified that she saw no other cars or people on the roads or along the roadside during the pursuit.

Mr. Dite's lawyer asked her how she felt during the pursuit, and she testified:

A. For the most part I felt pretty—pretty calm. You know, I wasn't— like, I don't know, it—it wasn't necessarily a scary thing or anything. I was more nervous that he—or that we wouldn't make it home to the babies kind of thing, you know? That was—that was my main thought was just—

Q. How did you feel about your safety?

6

A.   I wasn't—I feel pretty—you know, I trust Jake in his driving.  He's
     pretty—he's pretty knowledgeable when it comes to driving and
     how to control certain things.  So, I felt pretty good about that.  I
     didn't have a doubt.

RP at 146.

When cross-examined, Ms. Flett admitted that Mr. Dite did, at times, drive in the

opposite lane of travel, but added, "I believe it's just a driving technique, I guess you

could say . . . ."  RP at 148.  Ms. Flett denied that Mr. Dite skidded around corners or

almost ended up in a ditch.  It was her opinion that his driving was "controlled."

RP at 148.

Nevertheless, when pressed by the prosecution about whether she would have

been comfortable with Mr. Dite's driving if their kids had been in the car, she responded:

"I don't think that he would've drove like that if my kids were in the car. . . .  I mean, of

course not I wouldn't feel comfortable with that kind of driving with my kids in the car;

but, who would?"  RP at 149.  Asked if she would have "felt comfortable with that type

of driving" if she was pregnant, Ms. Flett answered, "No."  RP at 150.  She agreed she

would have felt a little in danger for the life of her child.  She acknowledged in cross-

examination that Mr. Dite was the "bread winner of the family" and that if he went to jail,

it would be a financial hardship.  RP at 149.

On redirect, Ms. Flett reiterated that during the circumstances of Officer Glover's

pursuit—with only her and Mr. Dite in the car—she felt comfortable.

7

During closing argument, the prosecutor prefaced some of her assertions about the evidence with "I think," or "I don't think"—for example, "I don't think there's a question to most of these," "I think it's been proven beyond a reasonable doubt," "I think that's been clear," "I think the only element that will lead to any discussion . . . ." RP at 169-70. Defense counsel did not object.

In defense counsel's closing, he conceded that the State proved some of the elements of attempting to elude but argued that it failed to prove beyond a reasonable doubt that Mr. Dite drove in a reckless manner. Pointing out that the instructions defined "reckless manner" as a "rash or heedless manner, indifferent to the consequences," CP at 52, defense counsel argued that Mr. Dite

> drove in the wrong lane on occasion. But, you heard his testimony. Mr. Dite returned to the correct lane around the corners, slowed down when navigating them. Does that really indicate an indifference, I don't care about any of this kind of stuff? Don't care about consequences? I submit it shows some concern for oncoming cars.
>
> Now, consider the other testimony by Officer Glover. He testified to the conditions. The roads were generally clear. No passing cars or [indiscernible]. I believe he testified there were no cars whatsoever on the streets. No pedestrians. Wasn't aware of anyone. No—no sign or crash into a ditch or anything. Didn't run a stop sign, but I don't think there were any. Never got airborne. He didn't really mention any fish tailing on these gravel roads. He did testify to the car sliding around on Bundy Road and skidding onto the shoulder to miss the deer. But neither time did the car go into the ditch.

RP at 178-79.

8

In rebuttal, the prosecutor encouraged jurors to remember what Officer Glover had said about the dangerousness of pursuits. She continued with another, only partially-transcribed argument that Mr. Dite now objects was misconduct:

> When [indiscernible] driving in the opposite lane of travel isn't reckless. That defies common sense. That defies logic. To say that this wasn't reckless because he—he did care and he slowed around the corners.

RP at 183. Defense counsel did not object to the argument at the time.

The jury found Mr. Dite guilty of the charges and answered yes to the special verdict asking if a person other than Mr. Dite or Officer Glover was threatened with physical injury or harm during the attempt to elude.

In anticipation of sentencing, Mr. Dite submitted a sentencing memorandum that stated he was eligible for the PSA authorized by RCW 9.94A.655, and he asked the court to impose it. He pointed out that he had two young children with Ms. Flett and they were expecting a third child in a few months. He expressed his willingness to sign "any releases necessary for the program." CP at 80. He supported his request with letters from his parents, Ms. Flett, and a neighbor.

The State responded with a sentencing memorandum that opposed the sentencing alternative. It emphasized Mr. Dite's history of driving-related offenses and charges, including a 2015 conviction for attempting to elude a police vehicle with the same endangerment aggravator, in connection with which Mr. Dite avoided serving time through a first-time offender waiver. It also attached three police reports with over a

9

dozen handwritten statements collected by police from witnesses to alleged reckless driving or anti-harassment violations by Mr. Dite in the Springdale area in 2018 and 2019.

At the sentencing hearing, the proposed judgment and sentence included the following criminal history for Mr. Dite:

| | Crime | Date of Sentence | Sentencing Court (County & State) | Date of Crime | A or J | Type |
|---|---|---|---|---|---|---|
| 1 | Attempting to Elude w/Endangerment by Eluding | 07/28/2015 | Stevens County, WA | 06/24/2015 | A | FC |
| 2 | Reckless Driving | 04/07/2022 | Stevens County District | 05/31/2018 | A | GM |
| 3 | Negligent Driving 2nd | 10/03/2018 | Spokane County District | 06/29/2018 | A | inf |
| 4 | DWLS 3rd | 03/12/2020 | Spokane Municipal | 03/07/2019 | A | M |
| 5 | Refuse to Comply with Police | 03/12/2020 | Spokane Municipal | 03/07/2019 | A | M |
| 6 | Assault 4 | 03/22/2022 | Steven County District | 05/12/2020 | A | GM |
| 7 | Reckless Endangerment (Amended from Reckless Driving) | 03/22/2022 | Steven County District | 05/12/2020 | A | GM |
| 8 | Reckless Endangerment (Amended from Reckless Driving) | 03/22/2022 | Steven County District | 07/27/2020 | A | GM |

CP at 175. The prosecutor explained that she would not ordinarily have provided the court with the police report and witness complaints about Mr. Dite's driving, but she wanted the court to be aware that others in Mr. Dite's community did not share the view of him conveyed in the letters submitted by the defense. She stated, "I understand that he is eligible," but argued that nothing, so far, had deterred Mr. Dite from driving in a manner that put others in danger. RP at 204.

Mr. Dite's lawyer urged the court to order the sentencing alternative, explaining that Mr. Dite was only 26 years old, with two young children who were very close to

him, and he lived with his parents who needed his help on their rural property. He

pointed out that Mr. Dite's prior eluding conviction occurred when he was 19 years old.

Mr. Dite's parents and Ms. Flett made statements supporting leniency, and Mr. Dite gave

a brief statement, apologizing for his actions.

The court rejected the sentencing alternative. In light of the aggravator, it imposed

a low-end, two-month standard range sentence that would take Mr. Dite to a total of 14

months' confinement. He explained why he would not impose the PSA, saying he had

reviewed the alternative and its community custody provisions, and "it's basically a year

of probation." RP at 216. He continued:

> I'm left with this question, you know, your parents say that [your] children
> are important to you, they are very attached to you. And yet, you have
> behaved in a way which puts your relationship with them at risk. You put
> your life at risk. You put your partner's life at risk running away from the
> cops.
>
> And you minimized it here today. You're going 80 miles an hour on
> back roads, back dirt roads, and your defense at trial was, well, I tended to
> slow down for the corners so it wasn't reckless. That isn't persuasive at all,
> and the jury made short work of that.
>
> It seems to me that you're still not quite getting why you are here
> and why the Legislature has directed that there is an aggravating
> circumstance of putting someone else at risk besides you and the police
> officer. And they make it stiff, a year.
>
> . . . .
>
> So, contacts with law enforcement, with the court system, have been
> pretty regular for the last five years or so. It looks like you maybe got the
> message for a little bit after that 2015 eluding, because there wasn't any
> problems for about three years after that. But, it's been pretty steady since
> then.

> And what this demonstrates is a . . . lack of awareness about how your activities affect others. A certain type of narcissism, that is an arrogance, that I can put myself at risk. I can put my children's mother at risk. And—well, that's okay, because I was worried about something. I have needs that I need to address, or I'm worried about what might happen to me. You haven't had any thought about you, as a father; your partner as a mother; the need of your children to have parents who are there and stable for them.

RP at 216-18. The court commented, "I don't see how a year of probation is going to change that . . . ." RP at 219.

Mr. Dite timely appealed. Among other relief, he sought resentencing, alleging that the trial court had failed to follow a statutory requirement to request that Department of Corrections (DOC) contact the Department of Children, Youth and Families (DCYF) to obtain any history that he had committed child abuse or neglect. He also argued that the court had not followed a statutory directive to give great weight to his minor children's best interest.

In this court's workup of the appeal, it determined that Mr. Dite had completed his sentence. The parties were invited to submit supplemental briefing on the mootness of the PSA issue. The parties agreed the issue was moot, but Mr. Dite encouraged the court to address it.

ANALYSIS

I.     EVIDENCE OF THE "DRIVING IN A RECKLESS MANNER" ELEMENT AND THE
       ENDANGERMENT AGGRAVATOR WAS SUFFICIENT

Mr. Dite contends that the State did not prove that he drove in a reckless manner,

indifferent to the consequences, "when the evidence showed that he slowed down before

corners, stayed in his lane on corners, and stopped for hazards in the road." Br. of

Appellant at 2. He argues that while Ms. Flett acknowledged that Mr. Dite was

attempting to flee the police officer, she said that "she did not feel unsafe with his

driving." *Id.* at 17.

Due process requires the State in a criminal prosecution to prove every element of

a crime beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746

(2016); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. In determining if the

evidence was sufficient to convict, the reviewing court must assess "whether, after

viewing the evidence in the light most favorable to the State, any rational trier of fact

could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192,

201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's

evidence and all inferences that reasonably can be drawn therefrom." *Id.*

Mr. Dite's argument fundamentally ignores the standard of review. Just as he

argued to jurors at trial, he asks us to find that because he did not cause an accident and

13

avoided <u>the most egregious and hazardous conduct</u>—speeding around blind corners in the wrong lane of traffic—he cannot be said to have been "heed-less."

The definition of "in a reckless manner" as meaning "'driving in a rash or heedless manner, indifferent to the consequences,'" was arrived at in *State v. Bowman*, 57 Wn.2d 266, 271, 356 P.2d 999 (1960) (emphasis omitted). *State v. Roggenkamp*, 153 Wn.2d 614, 622, 106 P.3d 196 (2005) (quoting *Bowman*, 57 Wn.2d at 271). In *Bowman* and the decisions that contributed to that definition, the objective was to distinguish "reckless manner" from ordinary negligence.

Another formulation in the Supreme Court's decision in *State v. Partridge* was it is a "'disregard for the safety of persons or property.'" 47 Wn.2d 640, 643, 289 P.2d 702 (1955) (quoting *State v. Dickert*, 194 Wash. 629, 632, 79 P.2d 328 (1938) (internal quotation marks omitted). It does not require proof of no heed whatsoever. As *Roggenkamp* held, it should not be defined for jurors as a "'willful or wanton disregard for the safety of persons or property.'" 153 Wn.2d at 622.

Evidence of driving in a "reckless manner" has been held to include, but not be limited to, "driving at excessive speeds, swerving in and out of traffic, running stop signs and red lights, driving into an oncoming lane of traffic, and ultimately running a red light without attempting to slow or stop." *State v. Young*, 158 Wn. App. 707, 723, 243 P.3d 172 (2010). Here, in a rural case, it included driving at excessive speeds (up to double the posted speed) on winding roads, some unpaved, with limited visibility, skidding

14

through corners, almost hitting deer, almost driving off the road at least twice, and—on

straightaways—constantly driving in the wrong lane of traffic.  Even Ms. Flett's

testimony, as helpful as she tried to be to Mr. Dite, was evidence that Mr. Dite drove in a

reckless manner.  RP at 146, 149 ("I was more nervous that he—or that we wouldn't

make it home to the babies"; "I wouldn't feel comfortable with that kind of driving with

my kids in the car; but, who would?").

As for the endangerment aggravator, the issue presented was not whether Ms. Flett

admits she was unsafe; it was whether she *was* unsafe.  The foregoing evidence and

Officer Glover's testimony about the dangerousness of the driving was ample evidence

supporting the jury's finding that Ms. Flett was threatened with physical injury or harm

by Mr. Dite's conduct.

II.     PROSECUTORIAL MISCONDUCT

Mr. Dite's remaining assignment of error is that statements made in closing

argument by the prosecutor improperly reflected her personal opinion about the case and

disparaged defense counsel.

To prevail on a claim of prosecutorial misconduct, a defendant must prove that the

prosecutor's conduct was improper and prejudiced his constitutional right to a fair trial.

*State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011); *State v. Dhaliwal*, 150

Wn.2d 559, 578, 79 P.3d 432 (2003).  Prejudice is only established if "there is a

substantial likelihood the misconduct affected the jury's verdict."  *State v. Brown*,

132 Wn.2d 529, 561, 940 P.2d 546 (1997).  Defense counsel's failure to object to the alleged misconduct constitutes a waiver of the error unless the defendant can show the misconduct is so flagrant and ill intentioned that no jury instruction could have cured the resulting prejudice.  *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009); *Thorgerson*, 172 Wn.2d at 443.

It is an unfortunate but "common linguistic slip" for attorneys in closing argument to preface assertions about what was proved or not proved with "'I think.'"  *State v. Jackson*, 150 Wn. App. 877, 889, 209 P.3d 553 (2009).  While the "I think" preface is improper in the context of a criminal trial and is grounds for objection, *see id.*, an assignment of error on appeal is often easily rejected.  It was easily rejected in *State v. Hoffman*, in which our Supreme Court observed:

> All of the statements objected to in this connection contained material which was supported by the evidence and none were of such nature that any error in the form of the argument could not have been obviated by a curative instruction, had one been requested.  In closing argument, the prosecuting attorney has a wide latitude in drawing and expressing reasonable inferences from the evidence.

116 Wn.2d 51, 94-95, 804 P.2d 577 (1991).  Prejudicial error does not occur unless "it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion."  *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983).

None of the prosecutor's statements challenged by Mr. Dite rose to the level of expressing a personal opinion of his guilt. Mr. Dite fails to identify any "I think" assertion for which jurors would have been required to rely on the prosecutor's "opinion" rather than evidence to which she referred.

Mr. Dite also complains that the prosecutor disparaged his trial lawyer when she responded to his argument that Mr. Dite had not driven in a reckless manner as "def[ying] common sense" and "def[ying] logic." RP at 183. A prosecutor "must not impugn the role or integrity of defense counsel." *State v. Lindsay*, 180 Wn.2d 423, 431-32, 326 P.3d 125 (2014). The argument did not disparage defense counsel or impugn his role, however. Her argument was not unlike the observation of the court, at sentencing, that "your defense at trial was, well, I tended to slow down for the corners . . . . That isn't persuasive at all . . . ." RP at 216. To say that an adversary's closing argument defies logic or common sense is directed at the argument, not the person.

III.   THE CONTENTION THAT THE SENTENCING COURT FAILED TO REQUEST A REPORT OF ANY CHILD ABUSE OR NEGLECT HISTORY IS UNPRESERVED

RCW 9.94A.655 governs eligibility for and the terms of the PSA. The sentencing alternative is available to certain nonviolent offenders caring for minor children. Under the alternative, the court waives imposition of a sentence within the standard range and imposes a sentence of 12 months of community custody. RCW 9.94A.655(5). The court

may impose conditions of community custody, including affirmative conduct requirements.  RCW 9.94A.655(6)(a).

RCW 9.94A.655(4) provides:

> *If the court is considering this alternative*, the court shall request that the department [of corrections] contact the department of children, youth, and families to determine if the agency has an open child welfare case or prior substantiated referral of abuse or neglect involving the offender or if the agency is aware of any substantiated case of abuse or neglect with a tribal child welfare agency involving the offender.

(Emphasis added.)  The subsection goes on to describe the particulars of an open child welfare case or prior substantiated referrals of abuse that DCYF is charged with providing to the court within seven days of receiving a release of information waiver from the offender.  RCW 9.94A.655(4)(a)-(d).  RCW 9.94A.655(4)(e) provides that the existence of a prior substantiated referral of child abuse or neglect or of an open child welfare case "does not, alone, disqualify the parent from applying or participating in this alternative."

The parties dispute the meaning of "considering" in the phrase, "If the court is considering this alternative."  We do not know what meaning the trial court ascribed or would have ascribed to "considering," because neither in Mr. Dite's written submission nor at the sentencing hearing did he ask the court to direct a request to the DOC.  He did not complain at sentencing that the court denied the sentencing alternative with no apparent attempt to make the request.

18

"RAP 2.5(a) states the general rule for appellate disposition of issues not raised in the trial court: appellate courts will not entertain them." *State v. Guzman Nunez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011), *aff'd*, 174 Wn.2d 707, 285 P.3d 21 (2012). The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176 Wn.2d 742, 749-50, 293 P.3d 1177 (2013). *Cf. State v. Canfield*, 154 Wn.2d 698, 707-08, 116 P.3d 391 (2005) (offender's limited procedural due process right to allocute at a sentence revocation hearing was waived where offender did not give "some indication of his wish to plead for mercy").

A case is moot if the court can no longer provide effective relief. *State v. Hunley*, 175 Wn.2d 901, 907, 287 P.3d 584 (2012). As a general rule, we do not consider questions that are moot. *Id.* Nevertheless, we may retain and decide a moot appeal if it "involves matters of continuing and substantial public interest." *Id.* In determining whether a case presents issues of continuing and substantial public interest, we consider (1) the public or private nature of the question presented, (2) the desirability of an authoritative determination for the future guidance of public officers, and (3) the likelihood of future recurrence of the question. *Id.* (citing *In re Pers. Restraint of*

No. 38878-6-III
*State v. Dite*

*Mattson*, 166 Wn.2d 730, 736, 214 P.3d 141 (2009) (citing, in turn, *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972))).

This is not an appropriate appeal in which to resolve the meaning of "considering," given the poorly-developed record. It is desirable to make clear that a trial court's failure to follow the procedure provided by RCW 9.94A.655(4) is unpreserved if not brought to the sentencing court's attention.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____, J.P.T.
Siddoway, J.P.T.

WE CONCUR:


_____, J.
Fearing, C.J.


_____, J.
Pennell, J.


20