[No. 42292. En Banc. April 27, 1972.]

RON SORENSON, *Appellant,* v. THE CITY OF BELLINGHAM *et al., Respondents.*

548

*Craig P. Hayes,* for appellant.

*Richard A. Busse,* for respondents.

UTTER, J.—The City of Bellingham denied an application by Ron Sorenson to run for a position on a board of freeholders, who were to draft a new city charter, on the ground that Sorenson owned no real property in the city. The city acted pursuant to relevant Washington statutory and constitutional requirements. In a declaratory judgment proceeding brought by Sorenson, the superior court upheld the validity of the city's action. Sorenson now appeals.

Sorenson's lack of ownership of property in the city is the sole basis of his disqualification. The constitutional question presented on appeal is whether the Bellingham ordinance conditioning qualification for office on property ownership violates the equal protection clause of the fourteenth amendment to the United States Constitution. We hold that it does.

The fortieth amendment to the Washington State Constitution and certain enabling statutes[1] provide that a

---

[1] Const. art. 11, § 10 (amendment 40). ". . . Any city containing a population of ten thousand inhabitants, or more, shall be permitted to frame a charter for its own government, consistent with and subject to the Constitution and laws of this state, and for such purpose the legislative authority of such city may cause an election to be had at which election there shall be chosen by the qualified electors of said city, fifteen freeholders thereof, who shall have been residents of said city for a period of at least two years preceding their election and qualified electors, whose duty it shall be to convene within ten days after their election, and prepare and propose a charter for such city."

RCW 35.22.140. "On the petition of a number of registered voters of a city equal to twenty-five percent of the total votes cast at the last preceding city election, the city council of a charter city shall, or without such petition may, cause an election to be held for the purpose of electing a board of fifteen freeholders for the purpose of preparing a new charter for the city by altering, revising, adding to or repealing the existing charter including all amendments thereto. The members of

body of citizens who are freeholders may be elected to prepare a new charter for cities in which they reside. The Bellingham ordinance was enacted pursuant to these provisions.[2] Freeholders are owners of either a legal or equitable title to real estate. *Daniels v. Fossas,* 152 Wash. 516, 278 P. 412 (1929).

■■ The relevant portion of the Fourteenth Amendment declares "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14, § 1. The equal protection clause applies to cases imposing qualifications on the right to hold public office. *Turner v. Fouche,* 396 U.S. 346, 24 L. Ed. 2d 567, 90 S. Ct. 532 (1970). State action is present where the ordinance is an enactment of a municipal corporation. *Hsieh v. Civil Serv. Comm'n,* 79 Wn.2d 529, 532, 488 P.2d 515 (1971).

A pivotal question is the determination of what standard is to be applied to determine whether the Washington laws and state constitution invidiously discriminate against non-property owners. The test differs depending upon the interests affected and the classification involved. On one hand, courts have given special treatment to interests they deem fundamental and have required the state to show a "compelling interest" to justify classification in these areas. *Shapiro v. Thompson,* 394 U.S. 618, 22 L. Ed. 2d 600, 89 S. Ct. 1322 (1969); *Kramer v. Union Free School Dist. 15,* 395

---

the board of freeholders must be qualified electors and must have been residents in the city for a period of at least two years prior to their election. At such election the proposition of whether or not a board of freeholders shall be created at all shall be separately stated on the ballots and unless a majority of the votes cast upon that proposition favor it, no further steps shall be taken in the proceedings."

RCW 35.22.050. "Whenever the population of a city is ten thousand or more, the legislative authority thereof shall provide by ordinance for an election to be held therein for the purpose of electing fifteen freeholders for the purpose of framing a charter for the city. The members of the board of freeholders must be qualified electors and must have been residents of the city for a period of at least two years prior to their election."

[2]City of Bellingham Ordinance No. 8031.

U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886 (1969); *Dunn v. Blumstein*, 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995. This would seem to reflect a belief that regulation of personal interests is of sufficient importance to require close judicial scrutiny. *See Developments in the Law—Equal Protection*, 82 Harv. L. Rev. 1065, 1129 (1969).

In areas dealing primarily with economic regulation, the court has upheld classifications, on federal constitutional grounds, unless the classifications are wholly irrelevant to the achievement of a valid state objective. *Turner v. Fouche, supra; Kotch v. Board of River Port Pilot Comm'rs*, 330 U.S. 552, 91 L. Ed. 1093, 67 S. Ct. 910 (1947); *McGowan v. Maryland*, 366 U.S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961). This has been a recognition of the fact that, in areas of economic regulation, classification may depend on local conditions upon which the court is not as well informed. It is, as well, a recognition of the superior legislative procedures for gathering information. *Carmichael v. Southern Coal & Coke Co.*, 301 U.S. 495, 81 L. Ed. 1245, 57 S. Ct. 868, 109 A.L.R. 1327 (1937); *Madden v. Kentucky*, 309 U.S. 83, 84 L. Ed. 590, 60 S. Ct. 406, 125 A.L.R. 1383 (1940); *Clark v. Dwyer*, 56 Wn.2d 425, 353 P.2d 941 (1960). In addition, the presumption of constitutionality and the approval given rational classifications in areas not affecting fundamental interests is based on the assumption that the institutions of state government are structured so as to fairly represent all the people. "However, when the challenge to the statute is in effect a challenge of this basic assumption, the assumption can no longer serve as the basis for presuming constitutionality." *Kramer v. Union Free School Dist. 15, supra* at 628.

In *Kramer*, the Supreme Court justified a special scrutiny of voting cases on the ground that voting is preservative of other basic civil and political rights and that any unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government. As emphasized by the court in *Dunn v. Blumstein, supra* at

336, " 'before that right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny.' "

The court declined to decide in *Turner* whether to apply the compelling interest test in cases involving restrictions on qualification for office. *Turner* involved a limitation of school board membership to freeholders and this limitation was challenged as violative of the equal protection clause of the Fourteenth Amendment. It was held that, even if a less stringent standard was applied, the classification rested on grounds wholly irrelevant to a valid state objective.

■ We could reach the same result for the same reasons used in *Turner* since restricting members of an elected committee to form a new city charter violates equal protection by either test. We believe it is important, however, to clearly state for the benefit of the lawmakers and voters of this state that a restriction placed upon qualification for office, unless necessary to promote a compelling state interest is unconstitutional.

■ Those cases dealing with restrictions on qualifications for office are of equal importance to those restricting the right to vote. A fundamental principle in our democracy is "the people should choose whom they please to govern them' " and "this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself." *Powell v. McCormack*, 395 U.S. 486, 547, 23 L. Ed. 2d 491, 89 S. Ct. 1944 (1969). The right to run for elective office is a fundamental right which should be restricted only by a compelling state interest. *Williams v. Rhodes*, 393 U.S. 23, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968).

An additional reason for choosing the compelling interest test is that, where a candidate representative of a viewpoint of affected voters is prevented from running, those voters who support him have lost an opportunity to cast their votes effectively. *Williams v. Rhodes, supra.* The majority may not burden the voting rights of a minority and, as was recognized in cases involving apportionment

schemes, "An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate . . ." *Lucas v. Forty-Fourth Gen. Assembly,* 377 U.S. 713, 736, 12 L. Ed. 2d 632, 84 S. Ct. 1459 (1964). Malapportionment is similar to restrictions on candidates in that they both decrease the effectiveness of the vote of a certain segment of the electorate.

■ The freeholder requirement, also, arguably trespasses on another disfavored area of classification by making possession of wealth a basis for the classification. "Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process." *Harper v. Virginia State Bd. of Elections,* 383 U.S. 663, 668, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966).

■ The requirement that one own property in a community in order to be a candidate conceivably runs afoul of yet another constitutionally protected right, the right to travel. In *Dunn,* the court struck down durational residence laws which singled out the class of bona fide state and county residents who recently exercised the constitutionally protected right to travel and penalized them directly. The court there applied the compelling state interest test to any classification penalizing the exercise of the right to travel.

Citizens who are bona fide residents either purchase or fail to purchase property in a given community for a variety of reasons. It would seem that, to the extent purchase of property is deferred in a community for reasons involving the desire of a resident to be free to travel, a compelling state interest is required to invade that right. A person desiring to be free to travel could meet all the requirements for valid residency but not wish to be encumbered by the restraints of property ownership.

■ In defense of the claim that there is a compelling state interest in the classification and that it is not wholly irrelevant to a valid state objective, the city urges that freeholders, as property owners, are most responsible for

the economic well-being of the city inasmuch as they are directly involved in the vitality of the physical base upon which the city rests. We believe this argument is unconvincing and shows both a lack of compelling state interest and that the classification is wholly irrelevant to a valid state objective.

The basic premise that landowners are more directly involved in the vitality of a city has been directly attacked in *Turner* where the court noted that lack of ownership of realty does not establish a lack of attachment to the community. However reasonable the assumption is that those who do own realty possess such an attachment, the state may not rationally presume that that quality is necessarily wanting in all citizens of the county whose estates are less than freehold. *Turner v. Fouche*, 396 U.S. 346, 364, 24 L. Ed. 2d 567, 90 S. Ct. 532 (1970). "In a society such as ours, characterized by its 'mobility' and 'anonymity' . . . a landowner is no more likely to be permanently established in a town—and, by that token, better qualified to govern—than one who is not a property owner." *Landes v. North Hempstead*, 20 N.Y.2d 417, 421, 284 N.Y.S.2d 441, 231 N.E.2d 120 (1967).

There are several other valid reasons for questioning the assumption that ownership of property in some way better qualifies an officeholder to guide the destinies of a city than one who is a nonproperty owner. Renters suffer from property taxes indirectly through rent increases; if their poverty forces them to rent, they have as much stake in the prosperity of their community as property-owning residents inasmuch as they are unable to move and may well be the first to suffer. Renters, indirectly affected by taxes in the form of increased rent, are just as interested as landowners in keeping a vital growing tax base and in the wise use of tax money. Finally, citizens may not always act strictly on the basis of their own monetary interests and the interests of propertied and nonpropertied citizens need not be antithetical. Comment, *Equal Protection and Prop-*

*erty Qualifications for Elective Office,* 118 U. Pa. L. Rev. 129, 135 (1969).

█ The city argues that the cases involving voting rights and qualifications for public office should not apply because the board of freeholders is not a regular governmental function and its members are not public officers as commonly defined in our state. *State ex rel. Brown v. Blew,* 20 Wn.2d 47, 145 P.2d 554 (1944); *State ex rel. Hamblen v. Yelle,* 29 Wn.2d 68, 185 P.2d 723 (1947). We find this to be a distinction without a difference. The board of freeholders is to draft a new city charter for submission to the voters of the city who will either approve or reject it. As such, the freeholders, as part of the political process, have significant impact. The individual voter is not free to propose his own plan. The electorate must either accept or reject the new charter as drafted by the freeholders, and a limitation on the viewpoint of those drafting the charter creates a very real and forbidden limitation on the choice of the voter. *Turner v. Fouche,* 396 U.S. 346, 24 L. Ed. 2d 567, 90 S. Ct. 532 (1970).

The nature of the remedy requested by Sorenson requires some discussion. On September 16, 1971, Sorenson filed a motion for an order restraining the city from accepting any more candidates for the position of freeholder, closing the filings of candidates or holding any election pursuant thereto. From the record before us, this motion was apparently denied and not further pursued. On the next day, a complaint was filed asking for a declaratory judgment holding the ordinance unconstitutional and void. He did not ask for other specific relief in the complaint except to pray for "such other and further relief as the Court may deem fit and proper." The cause was heard on September 24, 1971, and findings of fact, conclusions of law and judgment signed on October 20, 1971. Notice of appeal was filed, and the election held on November 2, 1971.

After the complaint asking for a declaratory judgment was filed and following the court's adverse ruling, Sorenson at no time requested affirmative relief which would have

impeded the election. The city, on its part, does not dispute Sorenson's right to have this court enter a judgment declaring Sorenson's rights in this controversy. It asks only that this court not invalidate the election or stay the proceedings of the board of freeholders regardless of our conclusions concerning the propriety of the ordinance.

The use of declaratory judgment to determine rights in this matter without a course of remedy is entirely appropriate.[3] As stated in E. Borchard, Declaratory Judgments (2d ed. 1941), at 9:

> The power to render judgments . . . is the power to adjudicate upon contested or adverse legal rights or claims, to interpret the law, and to declare what the law is or has been. . . . the *execution* of a judgment is a matter independent of the judicial determination . . . The court's function is completely performed by determining and deciding the case in a form binding upon the parties; and it is the judgment, and not the execution, which establishes their rights and constitutes the essence of judicial power.

And, at page 14:

> Rights are granted or recognized by the state not as abstractions, but for the purpose of legal protection. In this sense, rights without remedies are inconceivable, though the remedies may be conditional or limited or temporarily in eclipse; yet the two are not so intertwined that the right will disappear or lose all value, even though the remedy may be lost, *e.g.,* by laches or prescription.

We have previously enumerated the elements of justiciability necessary to render an issue susceptible to declaratory relief pursuant to RCW 7.24.

What are the principal elements of a justiciable controversy as contemplated by the Uniform Declaratory Judg-

---

[3]RCW 7.24.010. "Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed. An action or proceeding shall not be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."

ments Act, RCW 7.24? First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities be of such great and overriding public moment as to constitute the legal equivalent of all of them. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues. Any controversy lacking these elements becomes an exercise in academics and is not properly before the courts for solution.

*State ex rel. O'Connell v. Dubuque*, 68 Wn.2d 553, 558, 413 P.2d 972 (1966). All these elements were present when the court below assumed jurisdiction.

Our cases in which we have declined to render advisory opinions are not contrary to this view. These cases have found one or more elements of our requirements of justiciability lacking. *DeGrief v. Seattle*, 50 Wn.2d 1, 297 P.2d 940 (1956), is typical of these cases. In that case, the court declined to render a declaratory judgment because the plaintiff failed to show he had an existing right or interest in the particular statute he was asking the court to rule upon.

At the time of the original action, the parties had an existing and genuine, as distinguished from a theoretical right or interest, in the question at hand inasmuch as Sorenson was directly affected by the city's action. The judgment of the court could effectively operate, as distinguished from a purely political, administrative, philosophical, or academic conclusion, in that the judgment determined Sorenson's dispute with the city. The judicial determination of the controversy, but for this appeal, would have had the

force and effect of a final judgment upon the rights of the real parties in interest. The proceedings were distinctly and genuinely adversary in character and have brought to the court a good presentation of the major issues supported by good research and analysis.

 While this appeal was pending, the election was held. Sorenson did not ask that the election be set aside, and he took no legal steps to prevent its occurrence. It is a general rule that, where only moot questions or abstract propositions are involved, or where the substantial questions involved in the trial court no longer exist, the appeal, or writ of error, should be dismissed. There is an exception to the above stated proposition. The Supreme Court may, in its discretion, retain and decide an appeal which has otherwise become moot when it can be said that matters of continuing and substantial public interest are involved. *State ex rel. Yakima Amusement Co. v. Yakima County,* 192 Wash. 179, 73 P.2d 759 (1937); *National Elec. Contractors Ass'n v. Seattle School Dist. 1,* 66 Wn.2d 14, 400 P.2d 778 (1965); *Grays Harbor Paper Co. v. Grays Harbor County,* 74 Wn.2d 70, 442 P.2d 967 (1968). Criteria to be considered in determining the "requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question." *People ex rel. Wallace v. Labrenz,* 411 Ill. 618, 622, 104 N.E.2d 769, 30 A.L.R.2d 1132 (1952), quoted in *National Electric,* at page 20. This exception to the general rule obtains only where the real merits of the controversy are unsettled and a continuing question of great public importance exists. *State ex rel. Yakima Amusement Co. v. Yakima County, supra; National Elec. Contractors Ass'n v. Seattle School Dist. 1, supra.* We are, therefore, persuaded that the question presented should be decided here.

In the instant case, the real merits of the controversy remain unsettled; namely, whether requiring property ownership as a condition to qualify for office violates the

equal protection clause of the fourteenth amendment to the United States Constitution. This is a continuing question of great public importance which is likely to reoccur in the future in other units of state government desiring to revise their charters. The same question may again face the City of Bellingham if the present proposed charter revision is rejected and it is necessary to choose a new board of freeholders to draft another charter for submission. It is desirable that the question be determined for the future guidance of public officers.

■ The question of whether declaratory relief can be granted when alternative remedies are available has been summarized in *Reeder v. King County*, 57 Wn.2d 563, 564, 358 P.2d 810 (1961).

> The declaratory judgment act should be liberally interpreted in order to facilitate its socially desirable objective of providing remedies not previously countenanced by our law. However, a plaintiff is not entitled to relief by way of a declaratory judgment if, otherwise, he has a completely adequate remedy available to him. *Kahin v. Lewis* (1953), 42 Wn. (2d) 897, 259 P. (2d) 420; *Hawk v. Mayer* (1950), 36 Wn. (2d) 858, 220 P. (2d) 885; *Jacobsen v. King County Medical Service Corp.* (1945), 23 Wn. (2d) 324, 160 P. (2d) 1019; *Peoples Park & Amusement Ass'n v. Anrooney* (1939), 200 Wash. 51, 93 P. (2d) 362.

However, where, as here, a plaintiff must choose between declaratory relief or the harsh remedy of blocking or overturning an election, thereby jeopardizing a needed charter review, we conclude the alternative remedies to a declaratory judgment are not adequate.

Declaratory judgment is available to a plaintiff as an alternative to an unnecessarily stringent or harsh remedy. *Columbia Pictures Corp. v. DeToth*, 26 Cal. 2d 753, 161 P.2d 217, 162 A.L.R. 747 (1945).

■ Judgment is entered overruling the trial court and granting Sorenson the judgment he has prayed for, declaring that those provisions of Bellingham ordinance No. 8031, and, as well, those provisions of the fortieth amendment to the Washington State Constitution and RCW 35.22.140 and

.050, requiring him to be a freeholder violate the equal protection clause of the fourteenth amendment to the United States Constitution. Inasmuch as no further relief is requested, the board of freeholders currently elected will continue to function as permitted by the relevant constitutional provisions, statutes and ordinances.[4]

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, STAFFORD, and WRIGHT, JJ., concur.

NEILL, J. (concurring)—I agree with the result reached in the majority opinion. The freeholder requirement of the Bellingham ordinance is contra to the holding of the United States Supreme Court in *Turner v. Fouche*, 396 U.S. 346, 24 L. Ed. 2d 567, 90 S. Ct. 532 (1970). I would limit our reasoning and conclusion to that proposition. I am not in accord with some of the overly-broad, general statements in the majority opinion as to restrictions on eligibility for public office. Nor do I believe that the "right to travel" is in any manner involved in this case.

HALE, J., concurs with NEILL, J.

---

[4]Any further challenge to the existing board of freeholders by other individuals would appear to be barred by the doctrine of laches. *Williams v. Rhodes*, 393 U.S. 23, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968).