**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON

MARCH 19, 2026

CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 19, 2026

SARAH R. PENDLETON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| In the Matter of the Detention of | ) | No. 103252-8 |
|  | ) | (consolidated with |
| M.E. | ) | No. 103312-5) |
|  | ) |  |
|  | ) | EN BANC |
| In the Matter of the Detention of | ) |  |
|  | ) |  |
| R.S. | ) | Filed: <u>March 19, 2026</u> |
|  | ) |  |

YU, J.[*] — The primary two questions presented in these consolidated cases are (1) whether the caseload limits in the Standards for Indigent Defense following CrR 3.1 are mandatory and (2) whether the trial court exceeded its authority in ordering the King County Department of Public Defense (DPD) to provide counsel in the underlying civil commitment cases. The answer to the first question is yes. The caseload standards are mandatory. And the answer to the second question is no. The trial court did not order DPD to violate caseload standards.

---

[*] Justice Mary Yu is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

This case arises from several trial court orders requiring DPD and the King County executive (Executive) to provide appointed counsel for individuals facing civil commitment pursuant to the involuntary treatment act (ITA), ch. 71.05 RCW. It is undisputed the individuals were entitled to appointed counsel, and DPD provided counsel when it was ordered to do so. Nevertheless, both the King County Executive and DPD challenge different aspects of the trial court's orders.

The King County Executive argues that it should not have been ordered to provide appointed counsel because it is prohibited from doing so by the King County Charter. In King County, DPD has the exclusive authority to provide appointed counsel to respondents in ITA cases, without interference from the King County Executive or other elected officials. We agree and, accordingly, we reverse in part and vacate the portions of the orders pertaining to the King County Executive.

Although DPD is responsible for providing appointed counsel in ITA cases, it argues that the orders to provide counsel were improper under the circumstances presented here. DPD presented evidence to the trial court that the staff attorneys assigned to its ITA unit had reached their caseload limits, and that DPD was unable to recruit additional attorneys despite having sufficient funds to do so. As a result, DPD contends that the orders to provide counsel were, in fact, orders to violate

applicable caseload limits, which DPD argues exceeded the trial court's authority and violated GR 42.

In accordance with well-established principles of court rule interpretation, we hold that the caseload limits in the CrR 3.1 Standards for Indigent Defense[1] are mandatory. Courts do not have authority to order attorneys or agencies to accept case assignments in violation of applicable caseload limits. However, in this case, the trial court did not order DPD or its attorneys to violate the caseload limits. To the contrary, when the court ordered DPD to provide counsel, it expressly and correctly refrained from interfering with DPD's process for doing so. The court ordered the entity charged with providing counsel to provide counsel in whatever way it chose, and how the entity fulfilled that obligation was up to the entity. The court did not order DPD to do anything other than what it is required to do, which was to provide counsel. Therefore, we affirm the portions of the orders pertaining to DPD.

BACKGROUND

A.     Background on ITA cases and the appointment of counsel in King County

The ITA creates a process for the involuntary civil commitment of a person who, "as a result of a behavioral health disorder, [allegedly] presents a likelihood

---

[1] The Standards for Indigent Defense also appear following CrRLJ 3.1 for courts of limited jurisdiction and JuCR 9.2 for juvenile courts. This opinion references the CrR 3.1 Standards that were in effect at the time the underlying cases were heard in superior court.

of serious harm or is gravely disabled." RCW 71.05.150(1). Involuntary civil commitment pursuant to the ITA is "a significant deprivation of liberty that requires due process protection." *Dunner v. McLaughlin*, 100 Wn.2d 832, 838, 676 P.2d 444 (1984). Beyond mere physical confinement, "[t]he injurious effect of commitment can be manifested in a very short time," including social stigma and the development or worsening of symptoms. *In re Harris*, 98 Wn.2d 276, 279-80, 654 P.2d 109 (1982). Thus, involuntary commitment "is designed to be beneficial, but it can be harmful." *Id.* at 279.

Numerous statutory and constitutional safeguards are in place to limit the risk of erroneous ITA decisions, including the right to counsel. Any person who is "[i]nvoluntarily committed to a public mental health facility" at any stage of a court proceeding automatically qualifies as "indigent" for purposes of appointed counsel. RCW 10.101.010(3)(b). In addition, the ITA expressly requires appointed counsel at various stages throughout the proceedings. *E.g.*, RCW 71.05.148(6)(d), .150(2)(c), .230(6).

The local prosecutor's office typically represents "the individuals or agencies petitioning for commitment," although the prosecutor does not make the filing decisions for ITA cases.[2] RCW 71.05.130. Appointed counsel for the

---

[2] In cases initiated by state hospitals and facilities, the Attorney General's Office and the Office of Public Defense typically provide counsel. RCW 71.05.110(1)(c), .130.

respondent is typically provided by the local county. RCW 71.05.110(1)(a)-(b). Counties are entitled to reimbursement from the State for "reasonable direct costs in providing prosecutor services, assigned counsel and defense services, court services, and court clerk services." RCW 71.05.730(3)(b). As a result, it is undisputed that this case is *not* about funding and that there were no budgetary reasons for the shortage of ITA defense counsel.

Public defense services in King County are provided by DPD, which was created as an independent department within the county's executive branch in 2013. KING COUNTY CHARTER § 350.20.60. Led by an appointed county public defender, DPD is charged with "providing legal counsel and representation to indigent individuals in legal proceedings," including respondents in "mental illness and similar commitment proceedings." *Id.*; KING COUNTY CODE 2.60.050.

The King County Charter protects DPD's independence by providing that "[e]lected officials shall not interfere with the exercise of [its] duties" and that DPD "shall not have its duties, as established in this section, decreased by the county council or the county executive." KING COUNTY CHARTER § 350.20.60. The King County Executive's role is limited to (1) appointing the county public defender and members of the public defense advisory board, subject to confirmation by the county council, (2) removing the county public defender for cause, subject to appeal, and (3) helping DPD develop its budget and make

appropriation requests. *Id.* § 350.20.61; KING COUNTY CODE 2.60.026(B), (E), (G), .031(G); Clerk's Papers (CP) at 312.

As required by statute, King County has adopted local "standards for the delivery of public defense services," which include "[f]ollowing the Washington State Standards for Indigent Defense Services." RCW 10.101.030; KING COUNTY CODE 2.60.026(A)(5). The Standards for Indigent Defense, in turn, provide that "[t]he caseload of a full-time public defense attorney or assigned counsel should not exceed . . . 250 civil commitment cases per attorney per year." Former Standards for Indigent Defense std. 3.4 (2015). This limit "assume[s] a reasonably even distribution of cases throughout the year." Standards for Indigent Defense std. 3.3.

B.      DPD's capacity during the relevant time period for this case

The underlying events occurred in the spring and summer of 2024. At that time, DPD's ITA unit consisted of 14 staff attorneys and 2 supervisors. DPD made efforts to hire more ITA staff attorneys, but, like most Washington counties at the time, DPD faced persistent difficulties in recruiting new attorneys.

DPD's limited number of ITA attorneys affected its capacity to provide appointed counsel. To evenly distribute the 250-caseload limit throughout the year, an attorney can average no more than 20.8 cases per month. If an attorney was occasionally required to handle additional cases, DPD would make up for it by

giving that attorney fewer assignments in a subsequent month. However, at the time of the trial court proceedings, there were "no light months for the foreseeable future," which meant there were no opportunities to balance out an attorney's caseload with fewer assignments. CP at 39. In that situation, the attorney may reach their annual caseload limit in less than 12 months.

To handle the excess cases, DPD exercised its authority to contract with three private attorneys, who were able to handle 55 additional ITA cases each month. *See* KING COUNTY CODE 2.60.035(B). DPD attempted to contract with additional attorneys, but "[t]he number of attorneys willing and able to provide representation in ITA cases is extremely limited." CP at 48.

Despite DPD's efforts, its capacity could not keep up with the number of ITA cases being filed in King County Superior Court. In the 12-month period from July 2023 to June 2024, DPD was assigned roughly 4,901 ITA cases. Applying the 250-caseload limit, this meant that DPD received enough assignments for more than 19 full-time attorneys working at full capacity, though it had only 14 staff attorneys and 2 supervisors.

C.    Starting in April 2024, DPD's ITA unit reached capacity before the end of every month

On April 25, 2024, DPD notified the superior court that its ITA attorneys could accept only five more cases before reaching their caseload limits for April,

and, beyond that, DPD would not assign counsel to new ITA cases until May. DPD subsequently failed to assign counsel in several ITA cases, but it did so following a court order.

DPD resumed providing counsel for new ITA cases in May. However, on May 24, DPD notified the trial court that it would reach capacity the following week, after which it would not assign counsel to new ITA cases without a court order. On May 29, DPD notified the court that it would not assign attorneys to new ITA cases until June absent a court order.

The trial court subsequently issued a series of orders on May 29 and 30, ordering DPD to provide counsel in 43 outstanding ITA cases, and DPD complied.[3] The court then set an evidentiary hearing and requested supplemental briefing from DPD and the King County Executive, regarding their efforts to provide ITA counsel.

In its supplemental brief, DPD argued that the trial court did not have authority to order DPD to provide counsel, given its current staffing levels and the caseload limits in the Standards for Indigent Defense. DPD also filed declarations explaining its exclusive authority over public defense services in King County, its

---

[3] Following these orders, DPD filed an original action in this court, which was ultimately dismissed on the parties' stipulated motion. Clerk's Letter Ruling, *Khandelwal v. Holman*, No. 103134-3 (Wash. July 11, 2024).

methods for case counting and distribution, its duty to comply with the Standards, and its efforts to recruit additional ITA attorneys.

The petitioner in M.E.'s case, Fairfax Hospital, filed a supplemental brief, urging the trial court to continue ordering DPD to provide appointed ITA counsel, regardless of caseload limits. The brief further suggested that DPD's assertions about its limited capacity were exaggerated because the prosecutor's office was able to fulfill its ITA duties with fewer attorneys.

The King County Executive made a limited appearance to clarify certain aspects of the county's structure, particularly DPD's independence in providing public defense services. The Executive emphasized that this independence is necessary to shield DPD from actual or apparent conflicts and political influence.

On June 24, DPD advised the trial court that it would not assign more than eight cases per day for the rest of the month without a court order. On June 28, DPD sent a list of cases in which it would not assign counsel absent a court order, including the cases involving M.E. and R.S.

D.    Following an evidentiary hearing, the trial court ordered DPD and the King County Executive to provide appointed counsel for ITA respondents

The evidentiary hearing was held on June 28, 2024, with counsel appearing for DPD, Fairfax, and the King County Executive. DPD emphasized that "its whole mission is to be there to provide counsel," but it "simply lack[ed] the

9

bodies" to fill its vacant positions.  Pet'r's App., App. J at 331-32 (Verbatim Rep. of Proc. at 17-18 (King County Super. Ct., *In re Det. of A.A.*, No. 24-6-02228-1, June 28, 2024) (VRP)).  Although DPD would continue to provide counsel for as long as possible, it was "trying to get out ahead of this" to avoid a future "effective assistance of counsel problem."  *Id.* at 360 (VRP, *supra*, at 46).

After the hearing, the trial court entered orders in each case requiring that "DPD shall promptly appoint counsel," and DPD complied.  CP at 3; *see also* CP (RS) at 2.  Several days later, the court issued amended orders "requiring the DPD *and the Executive*" to provide counsel, stating that "[w]ho that attorney is and where they come from and what caseloads they maintain is a decision for the Executive and its delegate, the DPD."  CP at 7-8 (emphasis added); *see also* CP (RS) at 4.  The trial court certified its amended orders for immediate review.  *See* RAP 2.3(b)(4).

The King County Executive moved to vacate in part, which the trial court denied.  DPD and the King County Executive both sought direct review in this court, which was granted.  This court subsequently sent a letter to the parties requesting their responses to the following request: "Given the respective briefing of each party, the trial court's orders, and the fact that M.E. and R.S. are no longer parties, each party to this appeal is requested to briefly state the legal issue(s) they wish to have the court resolve and the specific relief sought."  Letter to Couns. at 2

(Aug. 26, 2025) (boldface omitted).  DPD, Fairfax, and the King County Executive each filed timely responses.  In addition, amici briefs were accepted from the American Civil Liberties Union of Washington, the National Association of Criminal Defense Lawyers, the Defender Initiative and the Washington Defender Association, Purpose Dignity Action, and Disability Rights Washington.[4]  Fairfax filed a joint response to amici.

## ISSUES

A.  Should this case be dismissed as moot?

B.  Was the King County Executive properly included in the amended orders to provide appointed counsel for ITA respondents?

C.  Did the trial court exceed its authority or violate GR 42 in ordering DPD to provide appointed counsel for ITA respondents under the circumstances presented here?

## ANALYSIS

A.  This case presents recurring issues of substantial public interest

On review in this court, Fairfax primarily argues that we should dismiss this case or otherwise decline to reach the merits based on considerations of mootness, procedural posture, and the sufficiency of the record.  We elect to reach the merits

---

[4] The cases were sealed at the trial court pursuant to RCW 71.05.620.  After receiving input from the parties, this court lifted the seal in part to allow public access to redacted copies of the briefs and the record.

because this case presents recurring issues of substantial public interest, which are properly before this court for resolution as a matter of law.

It is undisputed this case is moot because the underlying ITA cases are closed.[5] Fairfax also asks this court to take judicial notice of DPD's successful recruitment efforts in fall 2025, suggesting that the staffing situation has improved. Fairfax Hosp.'s Joint Resp. to Brs. of Amici Curiae at 4-5 & n.1. However, we may reach the merits of a moot case involving "'matters of continuing and substantial public interest.'" *Westerman v. Cary*, 125 Wn.2d 277, 286, 892 P.2d 1067 (1994) (quoting *Sorenson v. Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972)). We must consider "'(1) whether the issue is of a public or private nature; (2) whether an authoritative determination is desirable to provide future guidance to public officers; and (3) whether the issue is likely to recur.'" *Id.* (quoting *Hart v. Dep't of Soc. & Health Servs.*, 111 Wn.2d 445, 448, 759 P.2d 1206 (1988)).

The issues in this case are clearly public in nature. In addition, a shortage of ITA defense counsel is almost certain to recur in the future, either in King County or elsewhere in Washington. Indeed, after entering the amended orders for M.E. and R.S., the trial court continued to enter orders requiring DPD to provide ITA

---

[5] M.E.'s case was voluntarily dismissed on July 16, 2024. In R.S.'s case, a notice of release was filed on July 15, 2024.

counsel in other cases, although these later orders omitted the language pertaining to the King County Executive.

Nevertheless, Fairfax argues that our decision will not provide an "authoritative determination" because this court recently revised the Standards for Indigent Defense. It is certainly true that where the revised standards adopt different language, "the construction of the current standard will not be determinative of the construction of the revised standard." Fairfax Hosp.'s Joint Resp. to Brs. of Amici Curiae at 16-17. Yet, Fairfax argues on the merits "that trial courts have inherent authority to appoint counsel for ITA patients" *regardless* of caseload limits. Br. of Resp't Fairfax Hosp. at 28; *see also* Fairfax Hosp.'s Statement of Legal Issues & Relief Sought at 3 (Sep. 9, 2025) (issue 6). Resolving this argument does not turn on the specific language of the Standards, and it will clearly provide an authoritative determination going forward. Thus, we decline to dismiss this case on mootness grounds.

Fairfax further argues that the procedural posture of this case makes it a "poor vehicle" to interpret the Standards for Indigent Defense. Br. of Resp't Fairfax Hosp. at 19. Fairfax describes this case as a "labor dispute" and argues that civil litigation would be more appropriate because "no party to this appeal represents M.E., or any other indigent person." *Id.* at 21. However, M.E.'s right to counsel is undisputed, and there is no indication that M.E. was "aggrieved" by the

order appointing counsel. RAP 3.1. To the contrary, DPD and the King County Executive properly sought review because *they* were aggrieved by the trial court's orders, though they "were not formal parties to [the] trial court proceedings." *State v. G.A.H.*, 133 Wn. App. 567, 574, 137 P.3d 66 (2006).

The issues on review do not require this court to resolve a "labor dispute" because we are not presented with a claim that DPD violated its labor agreements. Instead, we are presented with narrow questions of law regarding the trial court's authority and the interpretation of court rules and local ordinances. Fairfax "is a proper party to defend" the trial court's orders, and it has vigorously done so through counsel from the prosecutor's office. *Id.* at 576 n.4. Additionally, the trial court expressly certified its amended orders for immediate review due to "a controlling question of law as to which there is a substantial ground for a difference of opinion" that "may materially advance the resolution of this and related ITA cases." CP at 8 (citing RAP 2.3(b)(4)). Given these circumstances, the procedural posture of this case does not prevent us from reaching the merits.

Finally, Fairfax argues the factual record is insufficient to reach the issues presented, pointing out that "the trial court's order did not *explicitly* require any DPD attorney to exceed the caseload limit." Fairfax Hosp.'s Joint Resp. to Brs. of Amici Curiae at 14 (emphasis added). However, this point goes to our analysis on

the merits, as discussed below. The record is sufficient to determine whether the trial court exceeded its authority or violated GR 42 as a matter of law.

In sum, we decline to dismiss this case and proceed to the merits. Our review is de novo because the facts are undisputed and the issues on review present questions of law, namely, the interpretation of local ordinances and court rules and whether the trial court exceeded its authority. *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 41, 156 P.3d 185 (2007); *State v. Hawkins*, 181 Wn.2d 170, 183, 332 P.3d 408 (2014); *Dep't of Soc. & Health Servs. v. Zamora*, 198 Wn. App. 44, 73, 392 P.3d 1124 (2017).

B.    The King County Executive should not have been included in the amended orders to provide counsel to ITA respondents

The King County Executive challenges the trial court's orders insofar as they require the Executive to participate in the provision of ITA defense counsel. It is undisputed the orders should be reversed and vacated in part on this issue.

King County's "home rule charter is the organic law of [the] county, just as the constitution is for the State." *Maleng v. King County Corr. Guild*, 150 Wn.2d 325, 331, 76 P.3d 727 (2003). Thus, a court cannot order King County officials to violate the King County Charter unless the charter itself is invalid. Here, there has been no argument or ruling that the King County Charter is invalid. Yet, the trial court's orders directly conflict with the charter's plain language.

The King County Charter establishes DPD as an independent department within the executive branch, with exclusive authority to "provid[e] legal counsel and representation to indigent individuals in legal proceedings." KING COUNTY CHARTER § 350.20.60. Elected officials, including the King County Executive, "*shall not* interfere with the exercise of these duties," and DPD "*shall not* have its duties, as established in this section, decreased by the county council *or the county executive*." *Id.* (emphasis added). The King County Executive's role is limited to appointments, removals, and helping DPD make budget requests. *Id.* § 350.20.61; KING COUNTY CODE 2.60.026, .031.

The trial court suggested that all aspects of the county's executive branch must ultimately be subject to the control of the King County Executive. However, Washington counties with home rule charters are not required to structure their governments around a unitary executive branch controlled by a single elected official. Instead, a county's home rule charter "may provide for such county officers as may be deemed necessary to carry out and perform all county functions." CONST. art. XI, § 4. Thus, the allocation of executive functions is determined in accordance with the King County Charter.

Article 3 of the King County Charter "divide[s] executive branch functions among various officers" so as not "to centralize power in one person." CP at 386-87 n.3. The King County Executive does not have unilateral authority to enact or

amend the charter, which explicitly prohibits the Executive and other elected officials from "interfer[ing]" with DPD's duties. KING COUNTY CHARTER § 350.20.60. The King County Executive has no authority to violate these provisions, and the trial court erred in ordering it to do so. We therefore reverse in part and vacate the portions of the orders pertaining to the King County Executive.

C.     The trial court correctly refrained from ordering DPD and its attorneys to violate caseload limits

Although DPD is responsible for providing appointed counsel in King County, DPD argues the trial court exceeded its authority and violated GR 42 by ordering it to provide counsel under the circumstances presented here. We hold as a matter of law that courts do not have authority to order defense counsel to violate the caseload limits in the Standards for Indigent Defense. However, in this case, the trial court did not order DPD or its attorneys to violate applicable caseload limits. Instead, the court properly ordered that "[b]arring any conflicts, DPD . . . shall continue to ensure an attorney represents respondent," and it correctly left all decisions as to "[w]ho that attorney is and where they come from and what caseloads they maintain" to be resolved by DPD. CP at 7-8. We therefore affirm the portions of the orders pertaining to DPD.

1. Caseload limits in the Standards for Indigent Defense are mandatory

DPD advances two lines of argument to challenge the trial court's orders in this case. First, DPD broadly argues that a public defender is entitled "to decline additional cases whenever the 'workload' of its attorneys 'prevents [them from] providing quality representation' . . . even if they have not reached caseload maximums." Pet'r King County Dep't of Pub. Def.'s Reply Br. at 19-20 (first alteration in original) (quoting WASH. STATE BAR ASS'N, STANDARDS FOR INDIGENT DEFENSE SERVICES std. 3.B (Mar. 8, 2024)). We decline to reach this argument because at the trial court, DPD did not assert that its attorneys' workloads prevented them from providing quality representation. To the contrary, DPD stated that it was "trying to get ahead" of the issue *before* there was "an effective assistance of counsel problem." Pet'r's App., App. J at 360 (VRP, *supra*, at 46). Thus, the question of whether, and under what circumstances, DPD may decline cases because its attorneys' workloads prevent them from providing quality representation is not properly before us.

Second, DPD argues "that the caseload limits are mandatory," while Fairfax counters that "[t]he caseload limits are guidelines." Pet'r King County Dep't of Pub. Def.'s Reply Br. at 20; Br. of Resp't Fairfax Hosp. at 33. This is a legal question of court rule interpretation, which can be resolved on the record presented. Our court "interprets court rules the same way it interprets statutes,

using the tools of statutory construction." *Hawkins*, 181 Wn.2d at 183. We hold the caseload limits in the Standards for Indigent Defense are mandatory, and courts do not have authority to order defense attorneys to violate them.

At the outset, it is necessary to clarify *which* caseload limits we must interpret. It is undisputed that this case implicates the CrR 3.1 Standards for Indigent Defense in our court rules. However, DPD also relies heavily on the Washington State Bar Association's (WSBA) *Standards for Indigent Defense Services*, noting that DPD's labor agreements require adherence to both the WSBA *Standards* and the Standards in our court rules. "The WSBA *Standards* are consistent with, but more comprehensive than, the Washington Supreme Court's Standards for Indigent Defense that are included in the Washington State Court Rules." WASH. STATE BAR ASS'N, STANDARDS FOR INDIGENT DEFENSE SERVICES 1 (rev. Mar. 8, 2024) (some italics and footnote omitted). The legislature has advised that the WSBA *Standards* "should serve as guidelines to local legislative authorities in adopting standards." RCW 10.101.030; *see also Davison v. State*, 196 Wn.2d 285, 297-98 & n.2, 466 P.3d 231 (2020).

In the context of this case, we confine our analysis to the CrR 3.1 Standards for Indigent Defense in our court rules. This is not a breach-of-contract case, so any interpretation of the WSBA *Standards* required by DPD's labor agreements would be dicta. Thus, the WSBA *Standards* (and other sources) may be helpful

persuasive authority, but this opinion focuses on the CrR 3.1 Standards for Indigent Defense in our court rules.

The Standards for Indigent Defense provide that the "maximum" caseload limit for "a full-time public defense attorney or assigned counsel *should* not exceed . . . 250 civil commitment cases per attorney per year." Standards for Indigent Defense std. 3.3; former Standards for Indigent Defense std. 3.4 (emphasis added). The fundamental question is whether the word "should" is advisory or mandatory in this context, as the Standards do not expressly address the meaning of "should" or other words of command. However, when the Standards are read in context, it is clear that a court does not have authority to order a defense attorney to violate the "maximum" caseload limit that the attorney "should" adhere to.

Attorneys must "certify to the courts that they comply with caseload limits," and "a signed Certification of Compliance with Applicable Standards must be filed by an appointed attorney by separate written certification on a quarterly basis in each court in which the attorney has been appointed as counsel." *Davison*, 196 Wn.2d at 299; Standards for Indigent Defense certification of compliance. Attorneys must be honest in these certifications to comply with their duty of candor to the court, and "the court shall ensure the lawyer is in compliance with the Certification of Compliance requirement" before appointing them. CrR

3.1(d)(4). As a practical matter, it is simply impossible to comply with all of these requirements if courts have authority to order defense attorneys to accept excessive assignments in violation of the applicable caseload limit.

In addition, the purpose of caseload limits cannot possibly be fulfilled if courts may simply order attorneys to violate them. Caseload limits are intended to "allow each lawyer to give each client the time and effort necessary to ensure effective representation." Standards for Indigent Defense std. 3.2. The parties correctly agree that a defense attorney violating the caseload limit does not *automatically* give rise to ineffective assistance of counsel. Br. of Resp't Fairfax Hosp. at 31-34; Pet'r King County Dep't of Pub. Def.'s Reply Br. at 26-27. Nevertheless, a violation of the caseload limit may provide evidence of ineffective assistance in individual cases. Moreover, it is widely recognized that excessive caseloads carry many "potential ethical and constitutional pitfalls," substantially increasing the risk of ethical violations and ineffective assistance. *Carrasquillo v. Hampden County Dist. Cts.*, 484 Mass. 367, 388, 142 N.E.3d 28 (2020).

All Washington attorneys must provide competent representation with reasonable diligence, free from concurrent conflicts of interest. RPC 1.1, 1.3, 1.7(a). Defense attorneys have additional obligations, including "minimum professional qualifications" with annual continuing legal education requirements, and attorneys representing ITA respondents must meet specific qualifications.

Standards for Indigent Defense stds. 14.1, 14.2(M). Yet, an attorney with excessive caseloads may not have enough time to become competent in a complex case, or they may be too busy to be diligent in responding to the needs of clients. "In addition, having too many clients and matters at once may create concurrent conflicts of interest . . . if attorneys are then forced to pick and choose between clients who will receive their limited time and attention, and others who will necessarily be neglected." *Carrasquillo*, 484 Mass. at 388. Thus, ordering an attorney to handle an excessive caseload "threatens to undermine the very right to counsel that the order seeks to protect." *Id.* at 370.

Fairfax emphasizes that "ineffective assistance has not been shown, or even alleged, in M.E.'s case." Br. of Resp't Fairfax Hosp. at 34. This is true, but a defense attorney cannot be forced to commit ethical violations or violate a client's constitutional rights before obtaining relief from excessive caseloads ordered by the trial court. *Lozano v. Cir. Ct. of Sixth Jud. Dist.*, 2020 WY 44, ¶ 58, 460 P.3d 721. Indeed, this court has recognized "the constitutional importance of maintaining proper caseloads in indigent defense cases," and the purpose of the Standards for Indigent Defense is to *prevent* violations by "address[ing] certain basic elements of public defense practice related to the effective assistance of counsel." *State v. Graham*, 194 Wn.2d 965, 970, 454 P.3d 114 (2019); Standards for Indigent Defense pmbl.

Nevertheless, Fairfax argues that the caseload limits cannot be mandatory because such a holding would "deprive the superior court of its inherent authority to safeguard the constitutional and statutory rights of indigent persons in involuntary civil commitment proceedings."[6]  Br. of Resp't Fairfax Hosp. at 2.  As DPD explains, this argument "glosses over the *specific* issue presented in this case."  Pet'r King County Dep't of Pub. Def.'s Reply Br. at 12.  There is no contention that the trial court erred in appointing counsel for ITA respondents.  Rather, DPD argues the trial court exceeded its authority and violated GR 42 by ordering counsel *to be provided by DPD* under the circumstances presented here, as discussed below.

This court recently acknowledged "the growing crisis involving steep declines in the number of public defense attorneys due to heavy caseloads and other factors."  *Washington Supreme Court Issues Interim Order on Public Defense Standards*, WASH. CTS. (June 9, 2025), https://www.courts.wa.gov/ newsinfo/?fa=newsinfo.pressdetail&newsid=52746.  In addressing this crisis, the caseload limits in the Standards for Indigent Defense are vital to ensure that public defense work is effective for clients and sustainable for practitioners.  Therefore, in accordance with the rule's plain language, context, and purpose, we hold that the

---

[6] Fairfax also argues that "the caseload limit for ITA cases is too low" because it is "lower than the caseload limit for misdemeanors."  Br. of Resp't Fairfax Hosp. at 34 (capitalization omitted).  This is a question for the rule-making process, not litigation.

caseload limits in the Standards for Indigent Defense are mandatory, and courts do not have authority to order attorneys to violate them.

2. The trial court did not order DPD or its attorneys to violate applicable caseload limits

Our holding that the Standards for Indigent Defense are mandatory does not fully resolve the case currently before us. As noted above, Fairfax correctly points out that the trial court "did not *explicitly* require any DPD attorney to exceed the caseload limit." Fairfax Hosp.'s Joint Resp. to Brs. of Amici Curiae at 14 (emphasis added). By contrast, DPD contends the trial court exceeded its authority and violated GR 42 by effectively "forc[ing] public defense attorneys to work beyond their caseload limits." Pet'r King County Dep't of Pub. Def.'s Opening Br. at 40 (underlining omitted). Therefore, to resolve this case, we must determine whether the trial court impliedly ordered DPD or its attorneys to violate applicable caseload limits. We hold that it did not. Therefore, the trial court's orders are affirmed as to DPD.

In its amended orders, the trial court concluded that "the attorneys DPD assigned to their ITA unit were at capacity per the case standards." CP at 6. Fairfax challenges this conclusion, arguing that DPD "provided no proof" its ITA unit had reached caseload limits, criticizing DPD's case counting methods, and asserting that DPD should have provided more detailed information about the

24

caseloads of individual attorneys. Br. of Resp't Fairfax Hosp. at 29-30. To the contrary, DPD provided declarations detailing its capacity, methods for counting cases, and other aspects of its management and oversight of public defense services. The trial court was entitled to credit DPD's undisputed evidence, and it correctly refrained from "delv[ing] inappropriately into the internal operations" of DPD. A.B.A., EIGHT GUIDELINES OF PUBLIC DEFENSE RELATED TO EXCESSIVE WORKLOADS 13 (Aug. 2009) (guideline 7 cmt.); *cf.* GR 42(a). Thus, the trial court properly determined that DPD's ITA staff attorneys had reached their caseload limits.

Nevertheless, we cannot infer that the trial court impliedly ordered DPD or its attorneys to violate caseload limits. To the contrary, when the court ordered DPD to provide an attorney, the court expressly declined to consider "[w]ho that attorney is and where they come from and what caseloads they maintain." CP at 7-8. This approach properly respected DPD's independence because judicial officers and staff "shall neither manage nor oversee public defense services." GR 42(d)(1). Thus, the trial court correctly recognized that it had no authority to "monitor[ ] attorney caseload limits" or to oversee DPD's "compliance with contracts, policies, procedures and standards." *Id.* § (d)(2).

There is also no indication that any other entity would be better positioned than DPD to provide counsel. As detailed above, DPD has exclusive authority to

provide appointed counsel to King County ITA respondents, and it is undisputed that sufficient funding was available for DPD to fulfill its role. In performing its duties, DPD is protected from judicial influence by GR 42 and from interference by other elected officials by the King County Charter. This independence is vital to avoid conflicts of interest, political pressures, or other extraneous factors that might improperly interfere with defense counsel's duties to their clients.

However, the exclusive *authority* to provide appointed counsel necessarily imposes on DPD the exclusive *responsibility* to do so, using its professional judgment to determine the best approach. Therefore, the trial court properly "refer[red] the party to a public defense agency or a public defense administrator to designate a qualified attorney," and it correctly refrained from interfering with DPD's process for locating and assigning such an attorney. *Id.* § (e)(1)(c). As a result, we hold the trial court did not exceed its authority or violate GR 42.

3.     We decline to consider potential remedies or political solutions and we deny the motions to strike

Finally, the parties and amici discuss at length the potential remedies that may be required if there is no public defender available to represent an ITA respondent, ranging from the convening of stakeholders and appointment of private counsel by the trial court to dismissal of the ITA case. However, that question is not before us.

The trial court ordered DPD to provide counsel and DPD complied. No other remedies were sought or imposed, and it would be premature to address remedies in this moot case. Accordingly, we deny two motions to strike that were passed to the merits. Both motions seek to strike arguments pertaining to remedies; however, because we decline to reach these arguments, it is unnecessary to strike them.[7] We also decline to consider political solutions or preventive measures to address the shortage of ITA defense counsel, which are questions beyond the scope of our review.

CONCLUSION

We reverse in part and vacate the portions of the trial court's orders requiring the King County Executive to provide appointed counsel to the ITA respondents in this case. However, we affirm the portions of the orders requiring DPD to provide such counsel.

---

[7] Fairfax moved to strike an argument in DPD's reply brief that the trial court could have "appointed private attorneys instead of ordering DPD to provide counsel for ITA patients." Fairfax Hosp.'s Mot. to Strike Portions of Reply Br. Based on Jud. Estoppel at 8 (July 9, 2025). DPD subsequently moved to strike references to the "invited error doctrine" from Fairfax's reply supporting its motion to strike. Pet'r King County Dep't of Pub. Def.'s Mot. to Strike Portions of Fairfax Hosp.'s Reply in Supp. of Mot. to Strike Portions of Reply Br. Based on Jud. Estoppel at 1 (July 31, 2025).

_____
Yu, J.P.T.

WE CONCUR:

_____
Stephens, C.J.

_____
Gordon McCloud, J.

_____
Johnson, J.

_____
Montoya-Lewis, J.

_____
Madsen, J.

_____
Whitener, J.

_____
González, J.

_____
Mungia, J.